No. 11-56843
_____

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
———————————

THOMAS ROBINS, individually and on
behalf of all others similarly situated,

*Plaintiff-Appellant*,

v.

SPOKEO, INC.,

*Defendant-Appellee*.

———————————

On Appeal from the United States District Court
for the Central District of California
Case No. 2:10-cv-05306
The Honorable Otis D. Wright, II

———————————

## SUPPLEMENTAL BRIEF OF PLAINTIFF-APPELLANT
———————————

JAY EDELSON
RAFEY S. BALABANIAN
RYAN D. ANDREWS
ROGER PERLSTADT
J. AARON LAWSON
EDELSON PC
350 North LaSalle Street,
   13th Floor
Chicago, IL 60654
(312) 589-6370

WILLIAM S. CONSOVOY
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, VA 22201
Tel: (703) 243-9423
will@consovoymccarthy.com

PATRICK STRAWBRIDGE
CONSOVOY MCCARTHY PARK PLLC
Ten Post Office Square
8th Floor South PMB, #706
Boston, MA 02109
Tel (617) 227-0548

July 11, 2016

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... ii

TABLE OF AUTHORITIES ................................................................... iii

BACKGROUND ...................................................................................... 1

   I.     The Complaint ............................................................................ 1

   II.    The Supreme Court's Decision ................................................. 3

ARGUMENT ............................................................................................ 8

   I.     The Procedural Violations Robins Alleges Entail a Degree of Risk to Congress's Interest in Fair and Accurate Credit Reports Sufficient to Meet the Concreteness Requirement ......................................... 9

         A.    Congress's judgment that the dissemination of false credit reports harms the subjects of those reports establishes that Robins alleges a concrete injury ............................... 11

               1.    Congress enacted the FCRA to curb the dissemination of false credit reports ...................................................... 13

               2.    Robins has not alleged a bare procedural violation divorced from the FCRA's interest in curbing the dissemination of false credit reports ............................ 18

         B.    The FCRA's protection against the dissemination of false credit reports follows from the common law .......................... 20

   II.    Robins Meets the Other Requirements of Article III Standing .............. 25

   III.   There Are No Other Issues Before This Court ....................................... 26

CONCLUSION ....................................................................................... 27

# TABLE OF AUTHORITIES

## Cases

*Bernard v. Beale*,
    (1617) 79 Eng. Rep. 1241 (K.B.) ............................................................... 21

*Cahlin v. Gen. Motors Acceptance Corp.*,
    936 F.2d 1151 (11th Cir. 1991) ................................................................... 2

*Church v. Accretive Health*, Inc,
    No. 15-15708, 2016 WL 3611543 (11th Cir. July 6, 2016) ............. 9, 12, 17

*City of Thousand Oaks v. Verizon Media Ventures, Inc.*,
    69 F. App'x 826 (9th Cir. 2003) ............................................................... 27

*Clapper v. Amnesty Int'l USA*,
    133 S. Ct. 1138 (2013) ............................................................................... 5

*Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*,
    438 U.S. 59 (1978) ................................................................................... 25

*Dun & Bradstreet v. Greenmoss Builders*,
    472 U.S. 749 (1985) ................................................................................. 23

*Dun v. Maier*,
    82 F. 169 (5th Cir. 1897) .......................................................................... 22

*FEC v. Akins*,
    524 U.S. 11 (1998) ..................................................................................... 5

*Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ................................................................................. 26

*FTC v. Manager, Retail Credit Co.*,
    515 F.2d 988 (D.C. Cir. 1975) ................................................................... 1

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) ................................................................................. 23

*Guimond v. Trans Union Credit Info. Co.*,
    45 F.3d 1329 (9th Cir. 1995) ........................................................... 2

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ................................................................. 6, 12

*Hermann v. Bradstreet Co.*,
    19 Mo. App. 227 (1885) ............................................................. 22

*In re Nickelodeon Consumer Privacy Litig.*,
    No. 15-1441, 2016 WL 3513782 (3d Cir. June 27, 2016) ........................... 9

*Jenkins v. Smith*,
    (1620) 79 Eng. Rep. 501 (K.B.) ..................................................... 21

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
    341 U.S. 123 (1951) ................................................................. 24

*Lansing v. Carpenter*,
    9 Wis. 540 (1859) ................................................................... 22

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................*passim*

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ................................................................. 26

*McClurg v. Ross*,
    5 Binn. 218 (Pa. 1812) ............................................................. 23

*Mitchell v. Bradstreet Co.*,
    22 S.W. 358 (Mo. 1893) ............................................................. 23

*Muskrat v. United States*,
    219 U.S. 346, 356-57 (1911) ....................................................... 25

*Newbold v. J.M. Bradstreet & Son*,
    57 Md. 38 (1881) ................................................................... 22

*Norfolk & Wash. Steamboat Co. v. Davis*,
    12 App. D.C. 306 (D.C. Cir. 1898) ........................................................... 23

*Nw. Ind. Tel. Co. v. FCC*,
    872 F.2d 465 (D.C. Cir. 1989) ................................................................. 27

*Pollard v. Lyon*,
    91 U.S. 225 (1875) ................................................................................... 23

*Public Citizen v. Dep't of Justice*,
    491 U.S. 440 (1989) ................................................................................... 5

*R v. Langley*,
    (1702) 90 Eng. Rep. 1261 (K.B.) ........................................................... 22

*Robins v. Spokeo, Inc.*,
    742 F.3d 409 (2014) ........................................................................ *passim*

*Runkle v. Meyer*,
    3 Yeates 518 (Pa. 1803) .......................................................................... 23

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ..................................................................... *passim*

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
    554 U.S. 269 (2008) ................................................................................. 21

*Steel Co. v. Citizens for Better Environment*,
    523 U.S. 83 (1998) ................................................................................... 25

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ................................................................................... 5

*Tenn. Valley Elec. Power Co. v. TVA*,
    306 U.S. 118 (1939) ................................................................................... 6

*Thorley v. Lord Kerry*,
    (1812) 128 Eng. Rep. 367 (K.B.) ........................................................... 22

*Tibble v. Edison Int'l*,
   820 F.3d 1041 (9th Cir. 2016) ................................................. 27

*United States v. Alexander*,
   287 F.3d 811 (9th Cir. 2002) .................................................. 27

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
   529 U.S. 765 (2000) ................................................. 4, 10, 20

**Statutory Provisions**

Fair Credit Reporting Act
   15 U.S.C. § 1681 *et seq* .............................................. *passim*

Act of May 31, 1790,
   ch. 15, § 2, 1 Stat. 124 .......................................... 24

**Legislative Materials**

115 Cong. Rec. 2335-2424 (1969) ............................................ 7, 13, 20

141 Cong. Rec. 10,916 (1995) ............................................... 17, 20

S. Rep. No. 104-185 (1995) .............................................. 14, 15, 17

S. Rep. No. 91-517 (1969) ................................................ 13, 14

*Consumer Information: Hearings Before the Subcomm. on Consumer Affairs
   of the Comm. on Banking, Currency, and Hous.*, 94th Cong. (1975) ... 16, 17

**Other Authorities**

2 Kent, Commentaries on American Law 16 (1827) ............................. 22

3 William Blackstone, Commentaries on the Laws of England ................ 22

Lawrence D. Frenzel, *Fair Credit Reporting Act: The Case for Revision*, 10 Loy.
   L.A. L. Rev. 409 (1977) .......................................... 16

Restatement (First) of Torts § 569 (1938) ............................... 24

Restatement (First) of Torts § 570 (1938) ............................................................24

Restatement (Second) of Torts § 559 (1977) ......................................................... 24

Restatement (Second) of Torts § 620 (1977) ........................................................24

Robert R. Stauffer,
    Note, *Tenant Blacklisting: Tenant Screening Services and the Right to*
    *Privacy*, 24 Harv. J. on Legis. 239 (1987) .................................................... 16

Theodore Sedgwick,
    A Treatise on the Measure of Damages 571 (1847) .................................... 24

Van Vechten Veeder,
    *History and Theory of the Law of Defamation*,
    3 Colum. L. Rev. 546 (1903) ...................................................................... 21

Vanessa Flores Waite, *When Your Gut Feeling Says He's Married*, Spokeo Blog,
    http://www.spokeo.com/blog/ 2016/07/when-your-gut-feeling-says-hes-
    married (July 7, 2016) ................................................................................. 20

Virginia G. Maurer,
    *Common Law Defamation and the Fair Credit Reporting Act*,
    72 Geo. L.J. 95 (1983) ................................................................. 13, 15, 21

William L. Prosser,
    Law of Torts § 112 (4th ed. 1971) .............................................................. 23

William T. Prosser,
    *Libel Per Quod*, 46 Va. L. Rev. 839 (1960) .......................................... 21, 22

The Court has asked the parties to address whether the particular procedural violations alleged by Thomas Robins ("Robins") entail a degree of risk sufficient to meet the concreteness requirement for Article III standing. The answer is "yes": Robins alleges that Spokeo, Inc. ("Spokeo") committed significant and repeated violations of the Fair Credit Reporting Act's ("FCRA") procedural requirements that led to dissemination of inaccurate information about important aspects of his profile, including his age, educational background, employment history, wealth level, and marital status. These allegations, which go to the heart of the concern that motivated Congress to enact the FCRA, easily meet Article III's concreteness requirement. The Court also asked whether any other issues remain outstanding in this appeal and what action this court should take with respect thereto. The answer to that question is "no." Accordingly, Appellant respectfully requests that the Court reverse the judgment of the district court dismissing this action and remand the case for further proceedings.

## BACKGROUND

### I.    The Complaint

The FCRA, 15 U.S.C. § 1681 *et seq.*, imposes "a comprehensive series of restrictions on the disclosure and use of credit information assembled by consumer reporting agencies." *FTC v. Manager, Retail Credit Co.*, 515 F.2d 988, 989 (D.C. Cir. 1975). Robins alleges that Spokeo violated Section 1681e(b), which required

the consumer reporting agency to "follow reasonable procedures to assure maximum possible accuracy" when it prepared a report about him. Plausibly alleging that Spokeo violated this provision, Robins brought this action under Section 1681n, which authorizes a private suit by a consumer against "[a]ny person who willfully fails to comply with any requirement imposed under this subchapter with respect to [that] consumer."[1]

"In order to make out a prima facie violation under § 1681e(b), a consumer must present evidence tending to show that a credit reporting agency prepared a report containing inaccurate information." *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (citing *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir. 1991)). Robins alleged that Spokeo falsely reported his educational background, his employment history, his wealth level, and his marital status, while also publishing a photograph of somebody else under Robins's name. ER40:8 ¶¶ 31-32. Robins further alleged that when Spokeo created

---

[1]    Robins's complaint also alleged violations of other FCRA requirements, including that Spokeo failed to provide required notices to various furnishers and users of its information, and that it failed to provide a required toll-free number that consumers can call to request free copies of their credit reports. ER40:12 ¶¶ 61-74 (relying on 15 U.S.C. §§ 1681e(d)(1)(A), (B); 1681b(b); 1681j(a)(1)(C)(i)). But Robins does not pursue these "claims" as independent bases for relief. While inartfully styled as "claims," these allegations are merely examples of Spokeo's willful failure to use reasonable procedures to assure maximum possible accuracy in its published reports. Because Robins alleges a single claim for relief under Section 1681e(b), the question of whether such allegations would be independently sufficient to establish Article III injury is not presented.

the report, it was aware of rampant inadequacies in its processes, was aware of its consistent failure to follow the procedures the FCRA requires, and, as a result, had willfully violated the FCRA. ER40:5 ¶22–6 ¶25, ER40:13 ¶ 64.

## II.    The Supreme Court's Decision

The district court dismissed Robin's action for lack of Article III standing. This Court reversed. *Robins v. Spokeo, Inc.*, 742 F.3d 409 (2014). This Court held that Robins's allegations regarding Spokeo's willful failure to follow reasonable procedures established injury in fact because Robins alleged that Spokeo had "violated *his* statutory rights, not just the statutory rights of other people," *id.* at 413, and the "interests protected by the statutory rights at issue are sufficiently concrete and particularized that Congress can elevate them," *id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 578 (1992)).

The Supreme Court vacated this Court's judgment. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016). The Court reiterated that Article III requires the plaintiff to show he has "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560 (1992)). Though the Supreme Court took no issue with this Court's determination that Robins had alleged a "particularized" violation of his FCRA rights, it concluded that this Court's ruling had "elided" Article III's independent "concreteness" requirement. *Id*.

For an injury to be concrete, the Court explained, it must be "'real,' and not 'abstract.'" *Id*. (citations omitted). But an injury can be "real" even if it is not "'tangible.'" *Id*. at 1549. "In determining whether an intangible harm," such as one that may result from the violation of federal statute, "constitutes injury in fact, both history and the judgment of Congress play important roles." *Id*. The Court affirmed that "Congress is well positioned to identify intangible harms that meet minimum Article III requirements," *id.*, and has the power to "define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before," *id.* (quoting *Lujan*, 504 U.S. at 580 (Kennedy, J., concurring in part and concurring in the judgment)). Likewise, "[b]ecause the doctrine of standing derives from the case-or-controversy requirement, and because that requirement in turn is grounded in historical practice, it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id*. (citing *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 775-77 (2000)).

On the other hand, a plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id*. "Robins could not," the Court explained, "allege a bare procedural violation, divorced from any concrete

harm, and satisfy the injury-in-fact requirement of Article III." *Id*. (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *Lujan*, 504 U.S. at 572). There must be at least "the risk of real harm" to the interest protected by Congress to "satisfy the requirement of concreteness." *Id*. (citing *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013)). But the Court was clear that "the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact" and, in those circumstances when it is, a plaintiff "need not allege any *additional* harm beyond the one Congress has identified." *Id*. at 1549-50 (citing *FEC v. Akins*, 524 U.S. 11, 20-25 (1998); *Public Citizen v. Dep't of Justice*, 491 U.S. 440, 449 (1989)).

Applied to the case at bar, the Court held that Congress, through the FCRA, "plainly sought to curb the dissemination of false information by adopting procedures designed to decrease that risk." *Id.* at 1550. Yet it also recognized that a procedural violation may not result in a concrete injury because "[a] violation of one of the FCRA's procedural requirements may result in no harm." *Id.* That might be the case, the Court suggested, if Spokeo's poor procedures had not actually led to any inaccuracy, or if the flawed information published as a result of Spokeo's poor procedures did not involve the "types of false information" (like a wrong zip code) that could "cause harm or present any material risk of harm" to consumers. *Id*. & n.8.

5

Justice Thomas joined the Court's opinion in full but wrote separately to explain why the ruling remained faithful to Article III's common-law tradition. The Court's decision, he wrote, adhered to the traditional distinction between public and private rights that "persist[ed] in modern standing doctrine." *Id.* at 1553-54 (Thomas, J., concurring). "Historically, common-law courts possessed broad power to adjudicate suits involving the alleged violation of private rights"— that is, "rights belonging to individuals, considered as individuals"—"even when plaintiffs alleged only the violation of those rights and nothing more." *Id*. at 1551 (citation omitted). "Common-law courts, however, have required a further showing of injury for violation of public rights—rights that involve duties owed to the whole community, considered as a community, in its social aggregate capacity." *Id*. (citation and quotations omitted). In such common-law disputes, Justice Thomas explained, the plaintiff needed to "allege 'special damage'" before "the suit could proceed." *Id*. at 1551-52.

Hewing to that tradition, Article III does not require a "plaintiff seeking to vindicate a statutorily created private right" to "allege actual harm beyond the invasion of that private right." *Id*. at 1553 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-74 (1982); *Tenn. Valley Elec. Power Co. v. TVA*, 306 U.S. 118, 137-38 (1939)). But Article III requires more when the suit involves a public right. *See id*. ("Congress cannot authorize private plaintiffs to enforce *public* rights in

their own names, absent some showing that the plaintiff has suffered a concrete harm particular to him."). Justice Thomas agreed that remand was the appropriate course because while some of Robins's allegations invoked public rights, "one claim in Robins' complaint rests on a statutory provision that could arguably establish a private cause of action to vindicate the violation of a privately held right." *Id.* Thus, if the FCRA "has created a private duty owed personally to Robins to protect *his* information, then the violation of the legal duty suffices for Article III injury in fact." *Id.* at 1554.

Justice Ginsburg, writing for herself and Justice Sotomayor, "agree[d] with much of the Court's opinion," but dissented because she did not see "the necessity of a remand to determine whether Robins' particularized injury was 'concrete'" because "Robins' allegations carry him across the threshold." *Id*. at 1554-55 (Ginsburg, J., dissenting). "Robins complains of misinformation about his education, family situation, and economic status, inaccurate representations that could affect his fortune in the job market." *Id*. at 1556. In her view, "[t]he FCRA's procedural requirements aimed to prevent such harm." *Id*. (citing 115 Cong. Rec. 2410-2415 (1969)).

**ARGUMENT**

The particular procedural violations alleged in this case entail a degree of risk sufficient to meet the concreteness requirement. "The FCRA seeks to ensure 'fair and accurate credit reporting.'" *Spokeo*, 136 S. Ct. at 1545 (quoting 15 U.S.C. § 1681(a)(1)). It does so, in part, by providing that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). Any consumer reporting agency that "fails to comply with" this requirement "with respect to any consumer is liable to that consumer." 15 U.S.C. § 1681n(a). Whether the FCRA is analyzed as a matter of legislative judgment, under the common law, or both, Congress's decision "to curb the dissemination of false information by adopting procedures designed to decrease that risk," *Spokeo*, 136 S. Ct. at 1550, satisfies the concreteness requirement of Article III.

Nor does Spokeo have any other legitimate basis for contesting Robins's Article III standing. Robins has alleged that the inaccuracies in his credit report are traceable to Spokeo's willful failure to comply with the FCRA's procedural duties. And, the statutory damages to which Robins is entitled if he prevails in this action provide a judicial remedy. Accordingly, Article III is no obstacle to hearing this dispute in federal court.

8

Finally, there are no other issues for this Court to resolve. Although Spokeo unsuccessfully asserted additional reasons for dismissal in the district court, it did not raise those arguments as alternative grounds for affirmance in the initial appeal to this Court. Those arguments were forfeited. The fact this case is on remand from the Supreme Court changes nothing. The Court should reverse the district court's judgment and remand the case for further proceedings.

## I.   The Procedural Violations Robins Alleges Entail a Degree of Risk to Congress's Interest in Fair and Accurate Credit Reports Sufficient to Meet the Concreteness Requirement.

The Supreme Court established a two-part framework for assessing whether Spokeo's violation of the FCRA has caused Robins concrete harm. First, this Court must determine whether the "intangible" interest to which Congress gave statutory protection is concrete. In fashioning this inquiry, the Court expressly rejected Spokeo's argument that concreteness turns on whether the statutory violation causes a resultant real-world harm. *Spokeo*, 136 S. Ct. at 1548; *see also Church v. Accretive Health, Inc*, No. 15-15708, 2016 WL 3611543, at *2 (11th Cir. July 6, 2016) (recognizing *Spokeo* held "that an injury need not be tangible to be concrete"). Rather, that inquiry turns (as it always has) on whether the "*legally protected interest*," *i.e.*, the statutory right, is concrete. *Spokeo*, 136 S. Ct. at 1548 (emphasis added) (quoting *Lujan*, 504 U.S. at 560); *see, e.g.*, *In re Nickelodeon Consumer Privacy Litig.*, --- F.3d ---, No. 15-1441, 2016 WL 3513782, at *7 (3d

Cir. June 27, 2016) (analyzing *Spokeo* and concluding that "[w]hile perhaps 'intangible,' the harm" at issue "is also concrete in the sense that it involves a clear *de facto* injury, *i.e.*, the unlawful disclosure of legally protected information"). Here, the FCRA protects a consumer's concrete interest in an accurate credit report about himself or herself.

Second, because the FCRA imposes a procedural obligation, the Court must ensure that Robins has not alleged "a bare procedural violation" that is "divorced" from the substantive interest Congress protected. *Spokeo*, 136 S. Ct. at 1549. In answering that question, the focus must be on both the nature of the "procedural violation" and the "types of false information" alleged. *Id*. at 1550 & n.8. Here, Robins has suffered concrete harm because he alleges that Spokeo committed rampant and persistent procedural violations that led to the dissemination of the types of false information about him that create a "material risk of harm" to the interest the FCRA protects. *Id*. at 1550. No more is required to establish injury in fact under Article III.

Last, the Court explained that this inquiry is especially easy if the statute "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id*. at 1549 (citing *Vt. Agency of Nat. Res.*, 529 U.S. at 775-77). That is the case here. The interest protected by Congress is a direct descendant of the interests guarded by the traditional torts of

libel and slander in one's profession, each of which was actionable *per se* at common law. Indeed, until the FCRA, inaccuracies in credit reports could be remedied, if at all, through an action for defamation under state law. Because the FCRA protects an intangible interest with a "close relationship" to a harm that, historically, authorized a suit at common law, the statutory interest is concrete for purposes of Article III.

### A. Congress's judgment that the dissemination of false credit reports harms the subjects of those reports establishes that Robins alleges a concrete injury.

Congress, on the basis of an exhaustive record, concluded that inaccurate credit reports caused significant harm both individually and in the aggregate. Individuals, for instance, experienced diminished job prospects and could have difficulty securing private financing; in the aggregate, widespread inaccuracies significantly disrupted credit markets. Judging the problem to be both severe and solvable, Congress, through the FCRA, adopted a series of reforms designed to reduce such inaccuracies to the maximum extent feasible and to hold consumer reporting agencies responsible. Specifically, the statute holds those agencies that fail to follow proper procedures liable to those consumers about whom they disseminate false information.

Congress has created a concrete statutory right. Accordingly, the plaintiff "need not allege any additional harm beyond the one Congress has identified."

11

*Spokeo*, 136 S. Ct. at 1549-50; *see id*. at 1553 (Thomas, J., concurring) ("A plaintiff seeking to vindicate a statutorily create private right need not allege actual harm beyond the invasion of that private right."). As the Eleventh Circuit just recently reiterated, it is settled law that "[a]n injury-in-fact, as required by Article III, 'may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing.'" *Church*, 2016 WL 3611542, at *3 (quoting *Havens Realty Corp.*, 455 U.S. at 373).

Further, Robins does not allege a bare procedural violation divorced from the harm to which the FCRA responds. Robins alleges that Spokeo committed serial procedural violations and that it published inaccurate information about, among other things, his age, family status, employment history, financial status, and educational attainment. These categories of false information are similar in type to information that numerous investigative studies have found is pervasively inaccurate on Spokeo.com. And while Spokeo is aware of these inaccuracies, it persists in creating and marketing reports about individuals. In short, "[t]he facts that Robins pled make it plausible that Spokeo acted in reckless disregard of duties created by the FCRA." *Robins*, 742 F.3d at 411 n.1. It is beyond doubt, then, that the harm resulting from the procedural violations alleged here is directly tethered to the underlying interest protected by the FCRA.

**1.  Congress enacted the FCRA to curb the dissemination of false credit reports.**

The FCRA's passage was preceded by decades of concern over inadequate protections against false statements regarding an individual's creditworthiness. Historically, the dissemination of a false credit report could be redressed through a common-law defamation action. *See infra* at I.B. By the early twentieth century, though, most American jurisdictions had adopted a "qualified privilege" for consumer reporting agencies accused of defamation. *See* Virginia G. Maurer, *Common Law Defamation and the Fair Credit Reporting Act*, 72 Geo. L.J. 95, 100 (1983). The effect of this privilege was to "place the burden of proving actual malice and actual damages on the plaintiff." *Id.* As a consequence, by the mid-twentieth century an individual who was "the subject of a credit report [was] all but unprotected in most jurisdictions." 115 Cong. Rec. 2414 (1969).

The vulnerability of consumers to false credit reports became a national concern in the wake of World War II when "a vast credit reporting industry . . . developed to supply credit information." S. Rep. No. 91-517, at 2 (1969). Credit bureaus, aided by "the growth of computer technology," began to supply information on millions of individuals' "financial status, bill paying record and items of public record such as arrests, suits, judgments," as well as "information on a person's character, habits, and morals," and "highly sensitive and personal information about a person's private life, such as racial or ethnic descent, domestic

trouble, housekeeping habits, and conditions of yard." *Id.* at 2, 4. By the 1960s, there was a consensus in Congress that the States had failed to adapt their regulatory approach to the modern credit industry. Because "unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system," Congress felt it needed to step in order "to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. §§ 1681(a)(1), (a)(4).

The FCRA was Congress's measured response. At the behest of the credit industry, the FCRA preempted most state-law claims by prohibiting "any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency … based on information disclosed pursuant to [the FCRA], except as to false information furnished with malice or willful intent to injure such consumer." *Id.* § 1681h(a); *id.* § 1681t(a) (preempting any law "inconsistent with any provision of this title"); S. Rep. No. 91-517, at 3 (1969) (noting that credit agencies facing the possibility of new regulations in 29 states "expressed a preference for Federal regulation rather than State legislation"). Congress also declined to make consumer reporting agencies strictly liable for the dissemination of false credit reports—as it could have done. *See* S. Rep. No. 104-185, at 43 (1995).

14

Congress instead "federalized and transformed" "common law defamation in the credit reporting context . . . into an action for negligence." Maurer, *supra*, at 115. Congress did so by training its focus on the procedures consumer reporting agencies used to ensure accuracy of the reports they disseminate. Specifically, the FCRA protects the consumer's interest in an accurate credit report by making "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681(b). Congress recognized that "the consumer reporting system handles almost two billion pieces of data per month and will never be perfectly accurate." S. Rep. No. 104-185, at 43. Requiring consumer reporting agencies to adopt certain prophylactic and corrective measures designed to limit inaccuracies to the extent possible would appropriately "balance the rights of consumers with those of consumer reporting agencies[.]" *Id.* at 49.

To that end, the FCRA makes a consumer reporting agency that is "negligent in failing to comply with any requirement imposed under [the act] with respect to any consumer . . . liable to that consumer in an amount equal to the sum of any actual damages sustained by the consumer as a result of the failure[.]" 15 U.S.C. § 1681*o*(a). And it makes a consumer reporting agency that "willfully fails to

15

comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer" for "any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000." *Id*. § 1681n(a)(1)(A). In other words, Congress distinguished between those consumer reporting agencies that acted negligently and those that acted willfully—making enhanced statutory remedies available only with respect to the latter.

Indeed, Congress's decision to allow for statutory damages was the result of careful deliberation. Before the FCRA allowed statutory damages, the law did "not always serve as a viable remedy." Lawrence D. Frenzel, *Fair Credit Reporting Act: The Case for Revision*, 10 Loy. L.A. L. Rev. 409, 429 (1977). "Civil actions brought pursuant to the [FCRA] tend[ed] to result in nominal—if any—damages to the consumer-plaintiff." *Id.* at 429-30. Accordingly, there was "little incentive on the part of the consumer to bring an action under the statute, and as a result, reporting agencies [felt] no real compulsion to comply with the protective mechanisms of the Act." *Id.* at 430. There were numerous calls to amend the FCRA to "provid[e] for minimum liability or presumed damages when a violation is proven." Robert R. Stauffer, Note, *Tenant Blacklisting: Tenant Screening Services and the Right to Privacy*, 24 Harv. J. on Legis. 239, 311 (1987); *see also Consumer Information: Hearings Before the Subcomm. on Consumer Affairs of the*

*Comm. on Banking, Currency, and Hous.*, 94th Cong., 6, 79, 105-06 (1975). Congress thus responded to "horror stories about inaccurate credit information and the inability of consumers to get the information corrected," 141 Cong. Rec. 10,916 (1995), by amending the FCRA to allow victims of willful violations to recover statutory damages. Congress understood that although harm was almost certain to occur from willful violations of the FCRA, it was "very difficult to prove." *Consumer Information*, *supra*, at 6.

In the end, Congress was "aware of concerns expressed by furnishers of information and the consumer reporting agencies that these provisions will result in unwarranted litigation," but believed this step was necessary to protect "consumers who have been wronged." S. Rep. No. 104-185, at 49. That was Congress's choice to make. *See, e.g.*, *Church*, 2016 WL 3611542, at *3 (recognizing that Congress may create "a new right" and thus "a new injury"). Congress did all that Article III requires of it. Congress "related the injury" (*i.e.*, invasion of a consumer's legal right to accurate information in his credit report) "to the class of persons entitled to bring suit" (*i.e.*, those individuals whose inaccurate reports are the product of the consumer reporting agency's failure to follow reasonable procedures). *Lujan*, 504 U.S. at 580 (Kennedy, J., concurring in part and concurring in the judgment). Congress's "judgment is . . . instructive and important" and, accordingly, is entitled to judicial respect. *Spokeo*, 136 S. Ct. at 1549.

17

### 2. Robins has not alleged a bare procedural violation divorced from the FCRA's interest in curbing the dissemination of false credit reports.

Robins is not "alleging a bare procedural violation." *Spokeo*, 136 S. Ct. at 1550. His complaint alleges Spokeo systematically failed to use reasonable procedures, and that its failure to do so when preparing his report rendered his profile inaccurate in important respects. "Robins pled, among other things, that Spokeo knew about inaccuracies in its reports and marketed its reports for purposes covered by the FCRA despite disclaiming any such uses." *Robins*, 742 F.3d at 411 n.1. Indeed, "Spokeo's founder—Harrison Tang—gave a statement regarding purported inaccuracies in [the agency's] consumer reports. According to Tang, 'We know there are a lot of things we need to improve. There are algorithms we can do that we haven't had time to improve the inaccuracies. There's a lot of holes. We know that and we admit that.'" ER40:6 ¶ 23.

In addition, "Spokeo has failed to develop an effective system to allow consumers to remove inaccurate information from their individual reports, or remove the reports from Defendant's website altogether." *Id*. ¶ 24. For example, "while [Spokeo] purports to allow individuals to remove their Spokeo listings, Spokeo intentionally limits removal requests based on unspecified or nonexistent criteria. Specifically, Spokeo frequently responds to individuals who attempt to remove information that: 'In order to prevent abuse, we must limit the frequency of

18

privacy requests. Please try again tomorrow. Government officials please use your @.gov email address for priority processing." *Id.* Even when successfully removed, an inaccurate report can reappear. ER40-1:26 ¶ 33 (Exh. G to FAC). In sum, "the facts that Robins pled make it plausible that Spokeo acted in reckless disregard of duties created by the FCRA." *Robins*, 742 F.3d at 411 n.1.

Moreover, Robins does not allege that these rampant procedural violations, led, for example, merely to trivial inaccuracies. Quite the contrary, the "types of false information" alleged here, *Spokeo*, 136 S. Ct at 1550 n.8, create a "risk of real harm" to the subjects of credit reports, *id*. at 1549. Again, Robins alleged that Spokeo disseminated a false report about him that misrepresented his age, marital status, earnings history, employment circumstances, and physical appearance. Inaccuracies in these categories of information creates a substantial risk that his employment prospects will be negatively affected. Employers may decide not to pursue a candidate they believe is overqualified, has a high salary expectation, or may have family commitments preventing the candidate from accepting the relevant responsibilities; nor may they be inclined to pursue candidates whose reports vary from the (accurate) information the applicant might himself provide the employer. *See Spokeo*, 136 S. Ct. at 1556 (Ginsburg, J., dissenting). Spokeo's misrepresentation of Robins's marital status also creates a real risk of harm, especially given Spokeo's promotion of its service for use by prospective romantic

partners. 136 S. Ct. at 1546; *see* Vanessa Flores Waite, *When Your Gut Feeling Says He's Married*, Spokeo Blog, http://www.spokeo.com/blog/2016/07/when-your-gut-feeling-says-hes-married (July 7, 2016).

"The FCRA's procedural requirements aimed to prevent such harm." *Spokeo*, 136 S. Ct. at 1556 (Ginsburg, J., dissenting) (citing 115 Cong. Rec. 2410–2415 (1969)). The FCRA responded to the "horror stories about inaccurate credit information and the inability of consumers to get the information corrected." 141 Cong. Rec. 10,916. Congress recognized that agencies "frequently confuse[d] one individual with another" and reproduced "[b]iased information" and "malicious gossip and hearsay." 115 Cong. Rec. at 2411. Put differently, the types of inaccuracies at issue in this case create a "material risk of harm" to the interests the FCRA protects and typify the "chain[] of causation" Congress had in mind when it enacted the statute. *Spokeo*, 136 S. Ct. at 1549 (citation omitted). The harm Robins alleges is therefore concrete.

  **B.**  **The FCRA's protection against the dissemination of false credit reports follows from the common law.**

History, too, is on Robins's side. As noted above, it "is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 136 S. Ct. at 1549. Indeed, it can be "well nigh conclusive with respect" to the Article III inquiry. *Vt. Agency of Natural*

20

*Resources*, 529 U.S. at 777. Here, a "close relationship" exists between the dissemination of false credit reports and common-law defamation. Long before the FCRA, a common-law defamation action could be brought against a credit agency for disseminating false information. *See* Maurer, *supra*, at 97; William T. Prosser, *Libel Per Quod*, 46 Va. L. Rev. 839, 842-43 (1960). That close relationship is sufficient to resolve the Article III question. *See, e.g.*, *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273-85 (2008).

Defamation has a long common-law lineage. *See* Van Vechten Veeder, *History and Theory of the Law of Defamation*, 3 Colum. L. Rev. 546, 549-69 (1903). Two species of defamation law are particularly relevant here: written defamation (or libel), and slander of an individual in his profession. Originally, one key limitation on the ability of a plaintiff to recover in an action for defamation was the requirement that the plaintiff prove a "temporal loss," or actual damages, arising from the disparaging statement. *See, e.g.*, *Bernard v. Beale*, (1617) 79 Eng. Rep. 1241 (K.B.).

Over time, however, the common law developed such that, for some defamation claims, harm was presumed even in the absence of proof. Harm was presumed, for instance, for claims of slander that "touch[ed]" the plaintiff "in his profession." *Jenkins v. Smith*, (1620) 79 Eng. Rep. 501 (K.B.). And once English common law courts began to distinguish between written and spoken defamation,

"*all libel, of whatever kind*, was held to be actionable without proof of any damage; or, as it was sometimes stated, from any libel some damage was conclusively presumed." Prosser, *Libel*, *supra*, at 842 (emphasis added); *see, e.g.*, *R v. Langley*, (1702) 90 Eng. Rep. 1261 (K.B.). By 1812, the distinction permitting recovery for *any* libel had "been recognized by the Courts for at least a century back." *Thorley v. Lord Kerry*, (1812) 128 Eng. Rep. 367, 371 (K.B.).

These common-law rules—permitting courts to hear claims for all libel, as well as for any defamation touching upon trade or business, without proof of consequential harm—were adopted in America as well. Blackstone noted, for example, that for certain categories of slander, including "scandalous words that . . . may impair [a man's] trade . . . an action may be had, without proving any particular damage to have happened, but merely upon the probability that it might happen." Blackstone, 3 William Blackstone, Commentaries on the Laws of England *124; *see* 2 Kent, Commentaries on American Law 16 (1827). Early American decisions thus applied the English common-law rule that general damages were permissible for any statement that touched upon the trade or credit of those engaged in business. *See Hermann v. Bradstreet Co.*, 19 Mo. App. 227, 232 (1885); *Lansing v. Carpenter*, 9 Wis. 540, 542 (1859); *Newbold v. J.M. Bradstreet & Son,* 57 Md. 38, 52-53 (1881); *Dun v. Maier*, 82 F. 169, 173 (5th Cir. 1897). A showing of consequential harm was unnecessary because this kind of

false statement "necessarily or naturally and presumptively causes pecuniary loss to the person of whom it is published." *Mitchell v. Bradstreet Co.*, 22 S.W. 358, 362 (Mo. 1893). Early American courts also evidenced widespread acceptance of the established principle that general damages, without proof of consequential harm, were available in all libel cases. *See Pollard v. Lyon*, 91 U.S. 225, 228 (1875) ("[M]any things are actionable when written or printed and published which would not be actionable if merely spoken, without averring and proving special damage."); *see, e.g.*, *Runkle v. Meyer*, 3 Yeates 518 (Pa. 1803); *McClurg v. Ross*, 5 Binn. 218 (Pa. 1812); *Norfolk & Wash. Steamboat Co. v. Davis*, 12 App. D.C. 306, 331-32 (D.C. Cir. 1898).

In sum, Anglo-American common law has long permitted claims by those who, like Robins, were the subject of false and defamatory reports, particularly reports that had the potential to harm their standing, credit, trade, or business. Such claims were actionable absent "evidence of actual loss," *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974), because the "experience and judgment of history" is "'that proof of actual damage will be impossible in a great many [defamation] cases'" even though "'it is all but certain that serious harm has resulted in fact.'" *Dun & Bradstreet v. Greenmoss Builders*, 472 U.S. 749, 760 (1985) (quoting W. Prosser, Law of Torts § 112 (4th ed. 1971)). Hence, "the existence of injury is presumed from the fact of publication." *Gertz*, 418 U.S. at 349.

The FCRA follows directly from this common-law tradition. Indeed, the Supreme Court recognized that "the law has long permitted recovery by certain tort victims," including victims of "libel" and "slander *per se*," "even if their harms may be difficult to prove or measure." *Spokeo*, 136 S. Ct. at 1549 (citing Restatement (First) of Torts §§ 569, 570 (1938)). That is what the FCRA does. It allows the subject of a credit report to recover when a consumer reporting agency disseminates false information about him. Like the common law, the FCRA makes such false dissemination actionable because it is likely to "deter third persons from associating or dealing with him," Restatement (Second) of Torts § 559, even if "no proof that serious harm has resulted from the defendant's attack upon the plaintiff's character and reputation," *id*. § 620 cmt. a. By making this intangible harm actionable, the FCRA is "consonant with what was, generally speaking, the business of the Colonial courts and the courts of Westminster when the Constitution was framed." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 150 (1951) (Frankfurter, J., concurring).[2]

---

[2] Congress's decision to afford certain victims of false credit reports statutory damages has additional historical support. *See* Theodore Sedgwick, *A Treatise on the Measure of Damages* 571 (1847) (describing the *"*large class of cases" where legislatures "endeavored to put a stop to all inquiry into the actual damages by fixing an arbitrary sum as the measure of relief"). In 1790, for example, the First Congress required copyright infringers to "pay the sum of fifty cents for every sheet," half to the owner and half to the government; no proof of actual loss was required. Act of May 31, 1790, ch. 15, § 2, 1 Stat. 124, 124-125.

But even if the FCRA deviates from the common law in some way, there is a sufficiently "close relationship" to satisfy the concreteness requirement. *Spokeo*, 136 S. Ct. at 1549. After all, the Article III question is not whether Robins could have successfully sued Spokeo for defamation in the late eighteenth century, but whether the FCRA authorizes an action "*of the sort* traditionally amenable to, and resolved by, the judicial process." *Steel Co. v. Citizens for Better Environment,* 523 U.S. 83, 102 (1998) (emphasis added) (citing *Muskrat v. United States*, 219 U.S. 346, 356-57 (1911)). If "Congress can create new private rights and authorize private plaintiffs to sue based simply on violation of those new legal rights," *Spokeo*, 136 S. Ct. at 1552 (Thomas, J., concurring), it certainly has the power to update the common law to the modern era. Congress is not so constrained that it may protect rights derived from the common law only when it accepts them in their fossilized form. Whether or not the FCRA perfectly "duplicate[s] the recovery at common law" it provides "a reasonably just substitute for the common-law or state tort law remedies it" partially "replaces." *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 87-88 (1978).

## II. Robins meets the other requirements of Article III standing.

Because Robins has suffered injury in fact, he has Article III standing. Neither the Supreme Court nor Spokeo has questioned that the injury alleged by Robins "is fairly traceable to the challenged action of the defendant" and "will be

redressed by a favorable decision." *Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). And for good reason. *Robins*, 742 F.3d at 414. As to traceability, Robins need not "establish"—let alone plead—"with any certainty" that the credit report created about him would have been accurate had Spokeo followed proper procedures. *Lujan*, 504 U.S. at 572 n.7; *see Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) ("A [litigant] who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered.") (citations and quotations omitted). Instead, Robins need only allege that the missing "procedural step was connected to the substantive result." *Massachusetts*, 549 U.S. at 518. As explained above, he has. And as to redressability, the FCRA affords Robins statutory damages, "which redress the violation of statutory rights." *Robins*, 742 F.3d at 414.

## III. There Are No Other Issues Before This Court.

In the district court, Spokeo pressed for dismissal on the additional ground that Robins failed to state a claim upon which relief could be granted. ER22:15. In particular, Spokeo argued that it is not a "consumer reporting agency" within the meaning of the FCRA and that it is immune under the Communications Decency Act. ER22:15, 21. The district court rejected both arguments. ER52:4-5. On appeal, the parties litigated only the issue of Robins's Article III standing; Spokeo

declined to defend the judgment on alternative grounds. *Robins*, 742 F.3d at 414 n.4 (noting that "standing is the only question before us").

Thus, no issues beyond whether Robins suffered a concrete injury in fact are before this Court on remand. It was Spokeo's duty to raise these arguments in defense of the district court's judgment. Its failure to do so renders them forfeited. *See, e.g.*, *City of Thousand Oaks v. Verizon Media Ventures, Inc.*, 69 F. App'x 826, 828 (9th Cir. 2003) ("Appellees waived their argument that the transaction violated section 4.2 by failing to raise it as an alternative ground for affirmance in their opening brief on appeal.") (citing *United States v. Alexander*, 287 F.3d 811, 817 n.2 (9th Cir. 2002)). Nor does the fact that the case is on remand from the Supreme Court afford Spokeo a second bite at the apple. *See Tibble v. Edison Int'l*, 820 F.3d 1041, 1049 (9th Cir. 2016) (citing *Nw. Ind. Tel. Co. v. FCC*, 872 F.2d 465, 470 (D.C. Cir. 1989)).

## CONCLUSION

The Court should reverse the judgment of the district court and remand the case for further proceedings.

Respectfully submitted,

/s/ William S. Consovoy

JAY EDELSON
RAFEY S. BALABANIAN
RYAN D. ANDREWS
ROGER PERLSTADT
J. AARON LAWSON
EDELSON PC
350 North LaSalle Street,
  13th Floor
Chicago, IL 60654
(312) 589-6370

WILLIAM S. CONSOVOY
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, VA 22201
Tel: (703) 243-9423
will@consovoymccarthy.com

PATRICK STRAWBRIDGE
CONSOVOY MCCARTHY PARK PLLC
Ten Post Office Square
8th Floor South PMB, #706
Boston, MA 02109
Tel (617) 227-0548

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C), undersigned counsel certifies that this brief:

(i)   complies with Court's order dated June 20, 2016 because it contains 6,477 words, including footnotes; and

(ii) complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font

<u>/s/ William S. Consovoy</u>

William S. Consovoy
*Counsel for Plaintiff-Appellant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 11th day of July 2016, a true and correct copy of the foregoing was filed with the Clerk of the United States Court of Appeals for the Ninth Circuit via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

<u>/s/ William S. Consovoy</u>

William S. Consovoy
*Counsel for Plaintiff-Appellant*