# MAYER·BROWN

Mayer Brown LLP
1999 K Street, N.W.
Washington, D.C. 20006-1101

Main Tel +1 202 263 3000
Main Fax +1 202 263 3300
www.mayerbrown.com

December 1, 2016

Andrew J. Pincus
Direct Tel +1 202 263 3220
Direct Fax +1 202 263 5220
apincus@mayerbrown.com

Molly C. Dwyer, Clerk of the Court
United States Court of Appeals for the Ninth
Circuit
P.O. Box 193939
San Francisco, CA 94119-3939

Re:   *Thomas Robins v. Spokeo, Inc.*, No. 11-
56843

Dear Ms. Dwyer:

We represent appellee Spokeo, Inc. in this matter and write to bring the Court's attention to several recent decisions: *Braitberg v. Charter Commc'ns, Inc.*, 836 F.3d 925 (8th Cir. 2016); *Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511 (D.C. Cir. 2016); *Nicklaw v. CitiMortgage, Inc.*, 839 F.3d 998 (11th Cir. 2016); *Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523 (5th Cir. 2016); and *Missouri v. Harris*, 2016 WL 6803046 (9th Cir. Nov. 17, 2016) (all attached).

The first four decisions all reject Robins's focus on the concreteness of the statutory right rather than the injury (*see* Robins Supp. Br. 9-10), instead reiterating the Supreme Court's core holding that "Article III standing requires a concrete injury even in the context of a statutory violation." 136 S. Ct. at 1549:

- *Braitberg* rejected the plaintiff's "content[ion] that a violation of a statutory right constitutes an injury in fact that is sufficient by itself" in the absence of a "material risk of harm." 836 F.3d at 929-30.

- *Hancock* emphasized that "the Supreme Court cautioned in *Spokeo* that some statutory violations could 'result in no harm,' even if they involved producing information in a way that violated the law." 830 F.3d at 514.

- *Nicklaw* likewise made clear that "Article III is not satisfied every time a statute creates a legal obligation and grants a private right of action for its violation"; rather, the "plaintiff must suffer some harm or risk of harm from the statutory violation." 839 F.3d at 1003.

- And *Lee* recognized that "the Supreme Court held that a bare allegation of a Fair Credit Reporting Act violation based on inaccurate reporting of

Mayer Brown LLP operates in combination with other Mayer Brown entities (the "Mayer Brown Practices"), which have offices in North America, Europe and Asia and are associated with Tauil & Chequer Advogados, a Brazilian law partnership.

Molly C. Dwyer, Clerk of the Court
December 1, 2016
Page 2

consumer information was insufficient to establish injury-in-fact, as 'not all inaccuracies cause harm or present any material risk of harm.'" 837 F.3d at 529-30 (quoting 136 S. Ct. at 1550).

Finally, this Court's decision in *Harris* confirmed that Article III injury-in-fact cannot be "remote, speculative, and contingent upon the decisions of many independent actors in the causal chain." 2016 WL 6803046, at *5. *See* Spokeo Supp. Br. 25-26.

Very truly yours,

/s/Andrew J. Pincus
Andrew J. Pincus

| 9th Circuit Case Number(s) | 11-56843 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) Dec 1, 2016 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | s/ Andrew J. Pincus

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by Hill v. Accounts Receivable Services, LLC, D.Minn.,
October 31, 2016

836 F.3d 925
United States Court of Appeals,
Eighth Circuit.

Alex Braitberg, on behalf of himself and all
others similarly situated, Plaintiff–Appellant,

v.

Charter Communications, Inc., Defendant–Appellee.

No. 14–1737
|
Submitted: January 13, 2015
|
Filed: September 8, 2016

**Synopsis**

**Background:** Consumer brought putative class action
against his former cable television provider, alleging that
provider retained his personally identifiable information
in violation of the Cable Communications Policy Act. The
United States District Court for the Eastern District of
Missouri, Henry E. Autrey, J., granted provider's motion
to dismiss. Consumer appealed.

**Holdings:** The Court of Appeals, Colloton, Circuit Judge,
held that:

[1] consumer's notice of appeal was timely, but

[2] consumer failed to allege an injury in fact.

Affirmed.

West Headnotes (7)

[1]     **Federal Courts**
        👉 Commencement and running of time in
        general

        Automatic e-mail message sent from district
        court's court management and electronic filing
        system, which contained docket text and

warned parties that case was closed, did not
satisfy requirement that each judgment be
set out in a separate document, and thus
district court's judgment was deemed entered,
for purposes of determining whether plaintiff
timely filed a notice of appeal, 150 days
after judgment was entered in civil docket;
given that a courtroom minute sheet and
docket text could not satisfy the separate
document requirement, an automatically
generated notice of the filing of the courtroom
minute sheet and entry of the docket text,
followed by a reproduction of the docket text,
likewise could not satisfy the requirement.
Fed. R. App. P. 4(a)(1)(A), 4(a)(7)(A)(ii), 4(a)
(7)(B); Fed. R. Civ. P. 58(a), 58(c)(2), 59(e),
77(d)(1).

Cases that cite this headnote

[2]     **Federal Civil Procedure**
        👉 In general;injury or interest

        A plaintiff invoking the jurisdiction of the
        court must adequately allege an injury in
        fact, an essential element of the irreducible
        constitutional minimum of standing. U.S.
        Const. art. 3, § 1 et seq.

        Cases that cite this headnote

[3]     **Federal Civil Procedure**
        👉 In general;injury or interest

        To establish constitutional standing, the
        party invoking federal jurisdiction bears the
        burden of demonstrating the requisite injury
        in fact, which must be both concrete and
        particularized and actual or imminent, not
        conjectural or hypothetical. U.S. Const. art. 3,
        § 1 et seq.

        1 Cases that cite this headnote

[4]     **Federal Courts**
        👉 Standing
        **Federal Courts**
        👉 Pleadings;Dismissal

        Court of Appeals reviews a district court's
        dismissal for lack of standing de novo,

accepting the material allegations in the complaint as true.

Cases that cite this headnote

**[5]    Federal Civil Procedure**
👉    In general;injury or interest

To establish constitutional standing, a concrete injury must actually exist, and it must be real, not abstract. U.S. Const. art. 3, § 1 et seq.

Cases that cite this headnote

**[6]    Federal Civil Procedure**
👉    In general;injury or interest

The violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact, but a plaintiff cannot allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury in fact requirement of Article III. U.S. Const. art. 3, § 1 et seq.

8 Cases that cite this headnote

**[7]    Telecommunications**
👉    Actions

Consumer, who alleged that his former cable television provider retained his personally identifiable information in violation of the Cable Communications Policy Act, failed to allege an injury in fact, and thus failed to establish Article III standing; although consumer alleged that provider violated its statutory duty to destroy the information, he did not allege that provider disclosed the information to a third party or used it in any way, consumer identified no material risk of harm from the retention of the information, and, absent a plausible allegation that retaining the information caused any concrete harm to the value of that information, consumer did not plausibly allege that the value of the cable services he purchased was diminished. U.S. Const. art. 3, § 1 et seq.; Communications Act of 1934 § 631, 47 U.S.C.A. § 551(e).

7 Cases that cite this headnote

**\*926**  Appeal from United States District Court for the Eastern District of Missouri—St. Louis, Henry E. Autrey, J.

**Attorneys and Law Firms**

Counsel who presented argument on behalf of the appellant was Joseph Siprut, of Chicago, IL. The following attorneys also appeared on the appellant brief; Anthony G. Simon, of Saint Louis, MO, and Ryan A. Keane, of Saint Louis, MO.

Counsel who presented argument on behalf of the appellee was Roman Paul Wuller, of Saint Louis, MO. The following attorney also appeared on the appellee brief; Robert J. Wagner, of Saint Louis, MO.

Before RILEY, Chief Judge, COLLOTON and KELLY, Circuit Judges.

**Opinion**

COLLOTON, Circuit Judge.

Alex Braitberg sued Charter Communications, Inc., alleging that Charter retained his personally identifiable information in violation of a section of the Cable Communications Policy Act, 47 U.S.C. § 551(e). Charter filed a motion to dismiss for lack of Article III standing and failure  **\*927**  to state a claim. The district court [1] granted the motion, and Braitberg appeals. We heard oral argument and then held the case pending a decision in *Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016), which informs our analysis of Article III standing. We now affirm the judgment.

I.

Alex Braitberg signed up for cable services with Charter Communications, Inc. around July 2007. Charter required Braitberg to provide various items of personally identifiable information, including his address, telephone number, and social security number, to activate the cable services. Braitberg then canceled his cable services around June 2010.

In March 2013, Braitberg contacted Charter and confirmed that Charter retained all of the personally identifiable information he had submitted in July 2007. Braitberg alleged that "Charter's uniform policy and practice has been to retain customer [personally identifiable information] indefinitely, long after customers' accounts have been terminated" and when it is no longer needed for providing services or collecting payments. This indefinite retention, according to Braitberg, is not necessary to satisfy Charter's tax, accounting, or legal obligations.

Braitberg sued on behalf of himself and a class of former Charter customers under the Cable Act. The statute provides that "[a] cable operator shall destroy personally identifiable information if the information is no longer necessary for the purpose for which it was collected and there are no pending requests or orders for access to such information [by the subscriber] or pursuant to a court order." 47 U.S.C. § 551(e). Braitberg alleged that Charter's retention of personal information after it was no longer required to provide services, collect payments, or satisfy tax, accounting, or legal obligations violated the rights of putative class members under the Cable Act.

Braitberg claimed that Charter's failure to destroy customers' personal information injured him and the proposed class members in two ways. First was an alleged "direct invasion of their federally protected privacy rights." Second, Charter allegedly deprived Braitberg and the class of the full value of the services they purchased from Charter. On this theory, Braitberg and others ascribed monetary value to controlling their personal information, and Charter failed to destroy the information as mandated by the Cable Act and by Charter's privacy policy. Braitberg sought an order enjoining Charter from indefinitely retaining former customers' personal information, statutory and punitive damages, and attorneys' fees. Braitberg moved to certify a class.

Charter moved to dismiss on the ground that Braitberg lacked standing under Article III, lacked statutory standing under the Cable Act, and failed to state a claim because he had not alleged damages. The district court convened a hearing on Charter's motion to dismiss on February 12, 2014. At the close of the hearing, the district court issued a minute order dismissing Braitberg's claims

without prejudice and dismissing the parties' motions on class certification as moot.

Because there is a question about the timeliness of the appeal, we provide some detail about the docket. The courtroom minute sheet for the hearing was entered on the docket and provided: "Parties present for ORAL Argument RE: Mtns [3] [11] **\*928** + [13]. Arguments heard. Motion to Dismiss Granted (HEA) Remaining Motions Denied as Moot. Cause Dismissed w/o prejudice [*sic*]." The text on the docket was substantially the same as that contained in the minute sheet, but was followed by the clerk's initials. An automatic Notice of Electronic Filing was generated by the district court's case management and electronic case filing system ("CM/ECF") and sent to the parties via electronic mail. The e-mail provided that "[t]he following transaction was entered on 2/12/2014," followed by the same text as the docket entry and the note "WARNING: CASE CLOSED on 02/12/2014."

On March 13, 2014, twenty-nine days after the district court dismissed the claims, Braitberg filed a "Motion to Modify Dismissal Order into an Order of Dismissal with Prejudice," because he thought a dismissal with prejudice was necessary for "a timely appeal." The district court granted this motion on March 14, 2014, and text reflecting the court's disposition was entered on the docket. Braitberg filed a notice of appeal on March 21, 2014, thirty-seven days after the district court dismissed his claims without prejudice at the hearing.

II.

Charter first contends that Braitberg did not timely file his notice of appeal and that we therefore lack jurisdiction. The district court dismissed Braitberg's claims without prejudice on February 12, 2014. The court did not explicitly grant Braitberg leave to amend the complaint, so its dismissal without prejudice is a "final, appealable order" that triggers the time for filing an appeal or a motion to alter or amend the judgment. *Quartana v. Utterback*, 789 F.2d 1297, 1299–1300 (8th Cir. 1986). Braitberg filed his notice of appeal thirty-seven days after the district court dismissed the suit without prejudice and filed his "Motion to Modify Dismissal Order into an Order of Dismissal with Prejudice" twenty-nine days after that dismissal.

Charter asserts that the notice of appeal was untimely because Federal Rule of Appellate Procedure 4(a)(1)(A) requires the notice to be filed "within 30 days after entry of the judgment or order appealed from," while Braitberg filed his notice thirty-seven days after the district court issued the dismissal without prejudice. Charter also contends that Braitberg's motion to modify the dismissal should be construed as an untimely motion to alter or amend a judgment under Federal Rule of Civil Procedure 59(e) that did not toll the time for filing a notice of appeal. The company points out that Appellate Rule 4(a)(4) specifies that only "timely" filed motions restart the appeal clock. Charter argues that Braitberg's motion was not timely because Civil Rule 59(e) requires motions to "be filed no later than 28 days after the entry of the judgment," and Braitberg filed his motion twenty-nine days after the district court dismissed the claims without prejudice.

 **[1]** We conclude that Braitberg's notice of appeal was timely for a different reason. The time for filing both a notice of appeal and a motion to alter or amend the judgment does not commence until "entry of the judgment." Fed. R. App. P. 4(a)(1)(A); Fed. R. Civ. P. 59(e). Civil Rule 58(a) provides that "[e]very judgment and amended judgment must be set out in a separate document," with certain exceptions not relevant here. If the separate document requirement applies but is not satisfied, then a judgment or order is deemed "entered" for purposes of the time for filing a notice of appeal and a Rule 59(e) motion when 150 days have run from the entry of the judgment in the civil docket. Fed. R. App. P. 4(a)(7)(A)(ii); Fed. R. Civ. P. 58(c)(2). If judgment here was not entered until 150 days after the docket **\*929** entry of February 12, 2014, then Braitberg's appeal is timely.

Charter argues that the e-mail sent to the parties on February 12, 2014, which contained the docket text and the warning that the case was closed, satisfied the separate document requirement. We disagree. The separate document requirement "must be 'mechanically applied' in determining whether an appeal is timely ... to avoid the uncertainties that once plagued the determination of when an appeal must be brought." *Bankers Tr. Co. v. Mallis*, 435 U.S. 381, 386, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978) (per curiam) (quotation omitted). We have held that "[n]either the courtroom minute sheet nor the court's docket book constitute a separate document" for purposes

of Rule 58(a). *Lupo v. R. Rowland & Co.*, 857 F.2d 482, 484 (8th Cir. 1988).

In this case, the automatic e-mail message generated by the CM/ECF system constituted the provision of notice to the parties required by Civil Rule 77(d)(1). That rule states that "[i]mmediately after entering an order or judgment, the clerk must serve notice of the entry ... on each party." Fed. R. Civ. P. 77(d)(1); *see Am. Boat Co. v. Unknown Sunken Barge*, 567 F.3d 348, 349–50 & n.3, 352–53 (8th Cir. 2009). Given that the courtroom minute sheet and the docket text do not satisfy the separate document requirement, *see Lupo*, 857 F.2d at 484, an automatically generated notice of the filing of the courtroom minute sheet and entry of the docket text, followed by a reproduction of the docket text, likewise cannot satisfy the requirement.

As the separate document requirement was not satisfied, the district court's judgment is deemed entered 150 days after the judgment was entered in the civil docket on February 12, 2014. Fed. R. App. P. 4(a)(7)(A)(ii); Fed. R. Civ. P. 58(c)(2). Braitberg filed his notice of appeal thirty-seven days after the district court's judgment dismissing the case was entered in the docket, well before the district court's judgment was deemed "entered" and the time for filing a notice of appeal began to run. Although the notice of appeal was filed prematurely, "[a] failure to set forth a judgment or order on a separate document when required by Federal Rule of Civil Procedure 58(a) does not affect the validity of an appeal from that judgment or order." Fed. R. App. P. 4(a)(7)(B); *Chambers v. City of Fordyce*, 508 F.3d 878, 881 (8th Cir. 2007) (per curiam). Braitberg's notice of appeal is thus timely and valid.

## III.

 **[2]**   **[3]**   **[4]** The parties next dispute whether there is a case or controversy under Article III over which the district court had jurisdiction. Braitberg argues that Charter violated his rights under the Cable Act and that he has standing to sue for redress of that violation. Article III of the Constitution limits the jurisdiction of the federal courts to cases or controversies. A plaintiff invoking the jurisdiction of the court must adequately allege an injury in fact, an essential element of the "irreducible constitutional minimum of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d

351 (1992). "The party invoking federal jurisdiction bears the burden of establishing" the requisite injury, which must be both "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.' " *Id.* at 560–61, 112 S.Ct. 2130 (quotation omitted). We review a district court's dismissal for lack of standing *de novo*, accepting the material allegations in the complaint as true. *Shain v. Veneman*, 376 F.3d 815, 817 (8th Cir. 2004).

Braitberg contends that a violation of a statutory right constitutes an injury in fact that is sufficient by itself to establish **\*930** standing under Article III. He asserts that there is no need for him to allege or show any "actual injury" arising from Charter's retention of his personal information. This court's decisions in *Hammer v. Sam's East, Inc.*, 754 F.3d 492, 498–99 (8th Cir. 2014), and *Charvat v. Mutual First Federal Credit Union*, 725 F.3d 819, 822 (8th Cir. 2013), seemed to accept that view. *Hammer*, citing *Charvat* and *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), declared that "the actual-injury requirement may be satisfied *solely* by the invasion of a legal right that Congress *created*." 754 F.3d at 498.

 **[5]** In *Spokeo*, however, the Supreme Court rejected this absolute view and superseded our precedent in *Hammer* and *Charvat*. While acknowledging that Congress is "well positioned to identify intangible harms that meet minimum Article III requirements," the Court emphasized that "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Spokeo*, 136 S.Ct. at 1549. "Article III," the Court explained, "requires a concrete injury even in the context of a statutory violation." *Id.* A concrete injury must "actually exist," and it must be "real," not "abstract." *Id.* at 1548.

 **[6]** "[T]he violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact." *Id.* at 1549. The *Spokeo* Court identified two examples in which plaintiffs were unable to obtain information that Congress had decided to make public as statutory violations that also established injury in fact. *Id.* at 1549–50. But a plaintiff cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III."

*Id.* at 1549. The Court envisioned scenarios in which a statutory violation would not amount to concrete injury, because there was no real harm or material risk of harm. In the context of the Fair Credit Reporting Act, the Court observed that certain procedural violations—such as a credit agency's failure to provide a required notice to a user when the agency's report was nonetheless entirely accurate, and the dissemination of a credit report with minor inaccuracies (such as an incorrect zip code)—likely could not, by themselves, establish standing because the violations result in no concrete harm. *Id.* at 1550.

 **[7]** With the benefit of *Spokeo*'s guidance, we conclude that Braitberg has not alleged an injury in fact as required by Article III. His complaint asserts "a bare procedural violation, divorced from any concrete harm." *Id.* at 1549. Braitberg alleges only that Charter violated a duty to destroy personally identifiable information by retaining certain information longer than the company should have kept it. He does not allege that Charter has disclosed the information to a third party, that any outside party has accessed the data, or that Charter has used the information in any way during the disputed period. He identifies no material risk of harm from the retention; a speculative or hypothetical risk is insufficient. Although there is a common law tradition of lawsuits for invasion of privacy, the retention of information lawfully obtained, without further disclosure, traditionally has not provided the basis for a lawsuit in American courts. *See* Restatement (Second) of Torts § 652A (Am. Law Inst. 1977); *see also Spokeo*, 136 S.Ct. at 1549. Modern courts have expressed a similar view. *See Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 538 (7th Cir. 2012) ("If, though not timely destroyed, [the personally identifiable information] **\*931** remained secreted in the video service provider's files until it was destroyed, there would be no injury."); *Gubala v. Time Warner Cable, Inc.*, No. 15–cv–1078–pp, 2016 WL 3390415, at \*5 (E.D. Wis. June 17, 2016) (dismissing complaint for lack of concrete injury where plaintiff alleged only that cable operator retained personally identifiable information).

Nor are we convinced that Braitberg has alleged an economic injury arising from an alleged diminution of the value of the cable services that he purchased from Charter. Braitberg alleges that consumers place a value on protecting their personal data against improper access and unauthorized secondary use. Therefore, he contends, Charter's retention of personal information deprives him

of "the full monetary value" of his transaction with the company. But without a plausible allegation that Charter's mere retention of the information caused any concrete and particularized harm to the value of that information, Braitberg has not adequately alleged that there was any effect on the value of the services that he purchased from Charter.

For these reasons, we conclude that Braitberg lacks Article III standing, and the case was properly dismissed. The judgment of the district court is affirmed.

**All Citations**

836 F.3d 925, 65 Communications Reg. (P&F) 826

Footnotes

1    The Honorable Henry E. Autrey, United States District Judge for the Eastern District of Missouri.

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Not Followed as Dicta Attias v. CareFirst, Inc., D.D.C., August 10, 2016

830 F.3d 511
United States Court of Appeals,
District of Columbia Circuit.

Whitney Hancock, On behalf of herself
and all others similarly situated, and
Jamie White, On behalf of herself and
all others similarly situated, Appellants
v.
Urban Outfitters, Inc. and
Anthropologie, Inc., Appellees.

No. 14-7047
|
Argued February 19, 2015
|
Decided July 26, 2016

**Synopsis**

**Background:** Customers brought putative class action against two retailers, alleging that retailers violated District of Columbia Consumer Identification Information Act (CII Act) and District of Columbia Consumer Protection Procedures Act (DCCPPA) by requesting customers' ZIP codes in connection with consumer credit card purchases. The United States District Court for the District of Columbia, Beryl A. Howell, J., 32 F.Supp.3d 26, granted retailers' motion to dismiss for failure to state a claim. Customers appealed.

**[Holding:]** The Court of Appeals, Millett, Circuit Judge, held that allegations were insufficient to plead cognizable injury.

Vacated and remanded with instructions to dismiss the complaint.

West Headnotes (5)

**[1]** **Federal Courts**
🔑 Necessity of Objection; Power and Duty
of Court

Federal courts cannot address the merits of a case until jurisdiction, that is, the power to decide, is established.

Cases that cite this headnote

**[2]** **Federal Civil Procedure**
🔑 In general; injury or interest

One essential and unchanging component of federal court jurisdiction is the requirement that a litigant have standing to invoke the authority of a federal court; until that jurisdictional threshold is crossed, the court cannot proceed at all in any cause.

5 Cases that cite this headnote

**[3]** **Federal Civil Procedure**
🔑 In general; injury or interest

The doctrine of Constitutional standing serves to identify those disputes which are appropriately resolved through the judicial process. U.S. Const. art. 3.

1 Cases that cite this headnote

**[4]** **Federal Civil Procedure**
🔑 In general; injury or interest
**Federal Civil Procedure**
🔑 Causation; redressability

The irreducible constitutional minimum of standing requires an injury in fact that is both concrete and particularized, and actual or imminent, not conjectural or hypothetical; plaintiffs must also demonstrate a causal connection between the injury and the conduct complained of, and a likelihood that a court ruling in plaintiffs' favor would remedy their injury. U.S. Const. art 3.

5 Cases that cite this headnote

**[5]** **Antitrust and Trade Regulation**
🔑 Particular cases
**Consumer Credit**

👉 Actions;injunction

Customers' allegations that two retailers requested their ZIP codes in connection with consumer credit card purchases were insufficient to plead cognizable injury, as required to have standing for their putative class action against retailers, alleging retailers violated District of Columbia Consumer Identification Information Act (CII Act) and District of Columbia Consumer Protection Procedures Act (DCCPPA); customers did not allege any consequences from the request for their ZIP codes, including any invasion of privacy, increased risk of identity theft, or pecuniary or emotional injury. D.C. Code § 28-3901 et seq.; D.C. Code § 47–3151 et seq.

5 Cases that cite this headnote

Appeal from the United States District Court for the District of Columbia (No. 1:13-cv-00939)

**Attorneys and Law Firms**

**\*512** Mikhael D. Charnoff argued the cause for appellants. With him on the briefs was Scott M. Perry, Arlington, VA.

James M. Burns argued the cause and filed the brief for appellees.

Before: Millett, Circuit Judge, and Edwards and Sentelle, Senior Circuit Judges.

**Opinion**

Millett, Circuit Judge:

Whitney Hancock and Jamie White made purchases with their credit cards at two clothing stores in the District of Columbia. As part of those credit-card transactions, the cashiers asked each for her zip code, and each provided it. Hancock and White then filed suit in federal court, alleging that those zip code requests violated two D.C. consumer protection laws. The district court dismissed the complaint with prejudice for failure to state a claim. But neither plaintiff has alleged a concrete Article III injury tied to disclosure of her zip code that could support standing, so the district court lacked jurisdiction to decide

the merits of the case. Accordingly, we vacate the district court's decision and remand for dismissal of the case.

**I**

**A**

The District of Columbia's Use of Consumer Identification Information Act ("Identification Act"), D.C. Code § 47–3151 et seq., provides in relevant part that "no person shall, as a condition of accepting a credit card as payment for a sale of goods or services, request or record the address or telephone number of a credit card holder on the credit card transaction form," id. § 47-3153.

The District of Columbia's Consumer Protection Procedures Act ("Consumer Protection Act"), D.C. Code § 28–3901 et seq., provides that, "whether or not any consumer is in fact misled, deceived or damaged thereby," no person may make a "misrepresent[ation] as to a material fact which has a tendency to mislead"; "fail to state a material fact if such failure tends to mislead"; or "use deceptive representations" in "connection with goods or services," id. § 28-3904(e), (f), (t).

**B**

In May 2013, Whitney Hancock made a credit card purchase at an Anthropologie retail clothing store in Washington, D.C. Hancock alleges that the cashier first swiped her credit card in a credit card machine. Then the cashier asked for her zip code and entered it into the store's point of sale register, rather than into the credit card machine.

The next month, Jamie White made two credit card purchases at an Urban Outfitters retail clothing store in Washington, D.C. Her factual allegations are identical in every relevant way: in both transactions, the cashier swiped her credit card in a credit card machine, asked for her zip code, and then entered it into the point of sale register.

Hancock and White filed a putative class action in the United States District Court for the District of Columbia. They allege that Urban Outfitters' and Anthropologie's

(the "Stores") zip code requests violated the Identification Act and the Consumer Protection Act. More specifically, Hancock and White allege that, because their zip codes are part of their addresses, the Stores' request for zip codes violated the Identification Act's ban on obtaining addresses as a condition of a credit card transaction. They also allege that the requests for their zip codes violated the Consumer Protection Act by (i) falsely implying to consumers that disclosure of their zip codes is required to complete their credit-card transactions; (ii) failing to state the material fact that the provision of **\*513** a zip code is optional; and (iii) deceptively representing that requests for zip codes are legal and necessary to complete credit-card transactions.

The district court dismissed the complaint for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). The court acknowledged the Stores' contention that Hancock and White had not pled an injury sufficient for Article III standing, but found it "unnecessary" to address that jurisdictional question because the complaint failed to state a claim. J.A. 165. With respect to the Identification Act, the court held that a zip code is not by itself an "address" that the law protects from disclosure. *Id.* at 165–167 (quoting D.C. Code § 47–3153). The court further ruled that Hancock's and White's failure to allege that the transactions would not have been completed if they had not provided their zip codes foreclosed their claims under the Consumer Protection Act.

Hancock and White appealed. Following oral argument, the Supreme Court granted review in *Spokeo v. Robins*, No. 13-1339, to decide whether a procedural violation of the Fair Credit Reporting Act, 15 U.S.C. §–1681 *et seq.*, can give rise to Article III standing. On May 20, 2015, we ordered this appeal held in abeyance pending the Supreme Court's decision in *Spokeo*, which was issued on May 16, 2016. *See Spokeo v. Robins*, ––– U.S. ––––, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016).

## II

**[1]** **[2]** Federal courts cannot address the merits of a case until jurisdiction—the power to decide—is established. One "essential and unchanging" component of federal court jurisdiction is the "requirement that a litigant have standing to invoke the authority of a federal court." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006). Until that jurisdictional threshold is crossed, "the court cannot proceed at all in any cause." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1868)).

The district court erred at the outset when it bypassed the jurisdictional question of Hancock's and White's standing and dove into the merits of this case. In doing so, the district court stepped where the Constitution forbade it to tread. That is because Hancock and White lack Article III standing in this case.

**[3]** **[4]** "[T]he doctrine of standing serves to identify those disputes which are appropriately resolved through the judicial process." *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). "[T]he irreducible constitutional minimum of standing" requires "an injury in fact" that is both "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Plaintiffs must also demonstrate "a causal connection between the injury and the conduct complained of," and "a likelihood that a court ruling in [plaintiffs'] favor would remedy their injury." *Id.* at 561, 595, 112 S.Ct. 2130.

Those requirements of injury, causation, and redressability "confine[ ] the federal courts to a properly judicial role" of resolving actual disputes between parties, rather than questions more appropriately addressed to the other branches of government. *Spokeo*, 136 S.Ct. at 1547. Because this case arises at the motion to dismiss stage, the complaint need only "state[ ] a plausible claim" that each element of standing is satisfied. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). We accept facts alleged in the complaint as true and draw all **\*514** reasonable inferences from those facts in the plaintiffs' favor. *See, e.g., Bregman v. Perles*, 747 F.3d 873, 875 (D.C. Cir. 2014).

**[5]** The complaint here does not get out of the starting gate. It fails to allege that Hancock or White suffered any cognizable injury as a result of the zip code disclosures. Indeed, at oral argument, Hancock's and White's counsel candidly admitted that "the only injury * * * that the named plaintiffs suffered was they were asked for a zip code when * * * [under] the law they should not have

been." Oral Arg. Tr. 5. In other words, they assert only a bare violation of the requirements of D.C. law in the course of their purchases.

In arguing for standing, Hancock and White simply assert that "[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." Pet. Br. at 20 (quoting *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (internal quotation marks omitted)). But they vastly overread that case. The Supreme Court has been clear that the legislature "cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing" under Article III. *Spokeo*, 136 S.Ct. at 1547–1548 (quoting *Raines v. Byrd*, 521 U.S. 811, 820 n.3, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997)) (internal quotation mark omitted). Instead, an asserted injury to even a statutorily conferred right "must actually exist," *Spokeo*, 136 S.Ct. at 1548, and must have "affect[ed] the plaintiff in a personal and individual way," *id.* at 1543 (quoting *Lujan*, 504 U.S. at 560 n.1, 112 S.Ct. 2130).

The Supreme Court's decision in *Spokeo* thus closes the door on Hancock and White's claim that the Stores' mere request for a zip code, standing alone, amounted to an Article III injury. *Spokeo* held that plaintiffs must have suffered an actual (or imminent) injury that is both particularized and "concrete * * * even in the context of a statutory violation." 136 S.Ct. at 1549. For that reason, a plaintiff cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id.* The plaintiff must allege some "concrete interest" that is "*de facto*," "real," and "actually exist[s]." *See id.* at 1548, 1549. Accordingly, while a legislature may " 'elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law,' " the legislature cannot dispense with the constitutional baseline of a concrete injury in fact. *Spokeo*, 136 S.Ct. at 1549 (quoting *Lujan*, 504 U.S. at 578, 112 S.Ct. 2130) (alteration in *Spokeo*).

Indeed, the Supreme Court cautioned in *Spokeo* that some statutory violations could "result in no harm," even if they involved producing information in a way that violated the law. 136 S.Ct. at 1550. The Court elaborated that, in the context of the Fair Credit Reporting Act at least: "An example that comes readily to mind is an incorrect zip code. It is difficult to imagine how the dissemination of an

incorrect zip code, without more, could work any concrete harm." *Id.*

If, as the Supreme Court advised, disclosure of an incorrect zip code is not a concrete Article III injury, then even less so is Hancock and White's naked assertion that a zip code was requested and recorded without any concrete consequence. Hancock and White do not allege, for example, any invasion of privacy, increased risk of fraud or identity theft, or pecuniary or emotional injury. *Cf. Spokeo*, 136 S.Ct. at 1549 (A "risk of real harm" or an "intangible" harm may satisfy Article III's requirement of concrete injury.). And without any plausible allegation of Article III **\*515** injury, the complaint fails to state a basis for federal court jurisdiction.

Finally, Hancock and White ask this court to change the district court's dismissal from one with prejudice to one without prejudice so that they can amend their complaint to allege standing. But having failed to request the opportunity to amend their complaint in district court, Hancock and White are in no position to ask this court to permit amendment in the first instance. "When a plaintiff fails to seek leave from the District Court to amend its complaint, either before or after its complaint is dismissed, it forfeits the right to seek leave to amend on appeal." *City of Harper Woods Employees' Retirement System v. Olver*, 589 F.3d 1292, 1304 (D.C. Cir. 2009). To be sure, Hancock and White included a passing reference to amendment in a footnote in their opposition to the motion to dismiss. But that does not suffice. *See United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1259 (D.C. Cir. 2004) ("While Federal Rule [of Civil Procedure] 15(a) provides that leave to amend shall be freely given when justice so requires, a bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought—does not constitute a motion within the contemplation of Rule 15(a)."). In short, Hancock and White are seeking leave to amend from the wrong court at the wrong time.

## III

Because the plaintiffs have not alleged any concrete injury in fact stemming from the alleged violations of D.C. law, the district court lacked jurisdiction. We accordingly take the only action open to us: we vacate the district court's

judgment on the merits and remand with instructions to dismiss the complaint.

*So ordered.*

**All Citations**

830 F.3d 511

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

839 F.3d 998
United States Court of Appeals,
Eleventh Circuit.

Roger Nicklaw, on behalf of himself and all
others similarly situated, Plaintiff–Appellant,

v.

Citimortgage, Inc., Defendant–Appellee.

No. 15–14216
|
Filed: 10/06/2016

**Synopsis**

**Background:** Mortgagor filed putative class action against mortgagee, alleging it failed to timely file certificate of discharge with county once mortgage was satisfied, in violation of New York law. Following transfer, the United States District Court for the Southern District of Florida dismissed. Mortgagor appealed.

**[Holding:]** The Court of Appeals, William Pryor, Circuit Judge, held that mortgagor failed to sufficiently allege a concrete injury, as required to have Article III standing.

Appeal dismissed.

West Headnotes (13)

**[1]** **Federal Courts**
👉 Dismissal or nonsuit in general

Court of Appeals reviews district court's dismissal of a complaint de novo.

Cases that cite this headnote

**[2]** **Federal Courts**
👉 Organization and jurisdiction of lower court;venue

Questions of subject matter jurisdiction may be raised at any time, even on appeal.

Cases that cite this headnote

**[3]** **Federal Courts**
👉 Organization and jurisdiction of lower court;venue

Although Court of Appeals ordinarily will not address issues raised for the first time on appeal, any time doubt arises as to the existence of federal jurisdiction, court is obliged to address the issue before proceeding further.

Cases that cite this headnote

**[4]** **Federal Courts**
👉 Rights and interests at stake;adverseness

There is no case or controversy, as required for Article III standing, when there are no adverse parties with personal interest in the matter. U.S. Const. art. 3, § 1.

Cases that cite this headnote

**[5]** **Federal Civil Procedure**
👉 In general;injury or interest

Article III restricts the jurisdiction of the federal courts to litigants who have standing to sue. U.S. Const. art. 3, § 1.

Cases that cite this headnote

**[6]** **Federal Civil Procedure**
👉 In general;injury or interest

**Federal Civil Procedure**
👉 Causation;redressability

The irreducible constitutional minimum of standing comprises three elements: injury in fact, causation, and redressability. U.S. Const. art. 3, § 1.

1 Cases that cite this headnote

**[7]** **Federal Civil Procedure**
👉 In general;injury or interest

Article III standing requirement in federal court serves judicial efficiency by preventing the judicial process from becoming no more than a vehicle for the vindication of the value

interests of concerned bystanders. U.S. Const.
art. 3, § 1.

Cases that cite this headnote

**[8]    Federal Civil Procedure**
☞ In general;injury or interest

Article III standing requirement in federal
court improves judicial decision-making by
assuring that the questions presented to the
court are resolved in a concrete factual
context. U.S. Const. art. 3, § 1.

Cases that cite this headnote

**[9]    Federal Civil Procedure**
☞ In general;injury or interest

**Federal Courts**
☞ Injury, harm, causation, and redress

A plaintiff has "injury in fact," as required
to make out a case or controversy under
Article III, if he suffered an invasion of
a legally protected interest that is concrete,
particularized, and actual or imminent. U.S.
Const. art. 3, § 1.

1 Cases that cite this headnote

**[10]    Federal Courts**
☞ Injury, harm, causation, and redress

A concrete injury as required to make out a
case or controversy under Article III must be
de facto, that is, it must actually exist. U.S.
Const. art. 3, § 1.

1 Cases that cite this headnote

**[11]    Federal Civil Procedure**
☞ In general;injury or interest

**Federal Courts**
☞ Nature of dispute;concreteness

Under certain circumstances, intangible
injuries may satisfy the Article III requirement
of concreteness; for example, a plaintiff who
alleges a violation of a statutory right to
receive information may suffer a "concrete
injury" if harm results. U.S. Const. art. 3, § 1.

1 Cases that cite this headnote

**[12]    Federal Civil Procedure**
☞ In general;injury or interest

Article III standing requires a concrete injury,
even in the context of a statutory violation
that grants a private right of action for its
violation; to have standing to invoke the
jurisdiction of a federal court, plaintiff must
suffer some harm or risk of harm from the
statutory violation. U.S. Const. art. 3, § 1.

3 Cases that cite this headnote

**[13]    Mortgages**
☞ Between parties to mortgage or their
privies

Mortgagor failed to sufficiently allege a
concrete injury, as required to have Article
III standing in putative class action against
mortgagee claiming it had filed certificate
of discharge with county more than 30-days
after satisfaction, in violation of New York
law; mortgagor failed to allege that he lost
money because mortgagee failed to timely file
certificate, he failed to allege that his credit
suffered as a result, nor did he even allege
that he or anyone else was aware that the
certificates of discharge had not been recorded
until after expiration of the 30-day period
required under New York statute. U.S. Const.
art. 3, § 1; N.Y. Real Property Law § 275; N.Y.
RPAPL § 1921.

Cases that cite this headnote

**\*1000**  Appeal from the United States District Court for
the Southern District of Florida, D.C. Docket No. 2:15–
cv–14125–JEM

**Attorneys and Law Firms**

Todd S. Garber, Finkelstein Blankinship Frei–Pearson &
Garber, LLP, White Plains, NY, Scott Rhead Shepherd,
Nathan C. Zipperian, Shepherd Finkelman Miller &
Shah, LLP, Weston, FL, for Plaintiff–Appellant.

Lucia Nale, Christopher Comstock, Thomas V. Panoff, Mayer Brown, LLP, Chicago, IL, Louis F. Bonacorsi, Bryan Cave, LLP, Saint Louis, MO, April Boyer, Stephen Allan McGuinness, K&L Gates, LLP, Miami, FL, for Defendant–Appellee.

Before MARCUS and WILLIAM PRYOR, Circuit Judges, and LAWSON,[*] District Judge.

**Opinion**

WILLIAM PRYOR, Circuit Judge:

This appeal requires us to decide whether a plaintiff has standing to sue when he alleges only a failure to record a satisfaction of mortgage within a statutory period and fails to bring suit until after that statutory violation has been remedied. Roger Nicklaw sold real estate and used the proceeds to satisfy a mortgage owned by CitiMortgage, Inc. New York law required CitiMortgage to file within 30 days a certificate of discharge with the county clerk to record that Nicklaw had satisfied his mortgage. N.Y. Real Prop. Law § 275; N.Y. Real Prop. Acts. Law § 1921. But CitiMortgage failed to record the satisfaction of mortgage until more than 90 days after the date of satisfaction. When Nicklaw discovered that the certificate had been recorded late, he filed a putative class action against CitiMortgage. The complaint alleges that CitiMortgage violated New York law by failing to record the certificate of discharge within the statutory period. The district court dismissed Nicklaw's complaint based on an earlier ruling that a previous suit filed by Nicklaw had become moot, but we need not address that issue. CitiMortgage argues, and we agree, that Nicklaw lacks standing to maintain this action. Because Nicklaw has not alleged that CitiMortgage's violation of New York law caused or could cause him any harm, we dismiss this appeal for lack of jurisdiction.

## I. BACKGROUND

On July 2, 2012, Nicklaw sold real estate that he owned in Buchanan, New York. He used the proceeds to satisfy the balance owed on a mortgage owned by CitiMortgage. Under New York law, CitiMortgage then had 30 days to file a certificate of discharge with the county clerk to record that Nicklaw had satisfied the mortgage. N.Y. Real

Prop. Law § 275; N.Y. Real Prop. Acts. Law § 1921. If CitiMortgage failed to record the certificate within 30 days, it would be liable to Nicklaw for $500. N.Y. Real Prop. Law § 275; N.Y. Real Prop. Acts. Law § 1921. This amount would increase to $1,000 after 60 days, and $1,500 after 90 days. N.Y. Real Prop. Law § 275; N.Y. Real Prop. Acts. Law § 1921. But CitiMortgage failed to record the satisfaction of mortgage until October 17, 2012.

In 2013, Nicklaw filed a putative class action against CitiMortgage in the Southern **\*1001** District of Florida that alleged that CitiMortgage violated sections 275 and 1921 by failing to record the certificate of discharge until over 90 days after Nicklaw satisfied his mortgage. CitiMortgage extended an offer of judgment to Nicklaw, Fed. R. Civ. P. 68, that offered him all the relief he requested in the complaint. When Nicklaw refused to accept the offer, CitiMortgage filed a motion to dismiss the complaint on the ground that the offer of judgment rendered the case moot. The district court agreed and dismissed Nicklaw's complaint. Nicklaw did not appeal that dismissal.

In October 2014, Nicklaw filed a second complaint against CitiMortgage in the Eastern District of Missouri, which was transferred to the Southern District of Florida. The complaint alleges that CitiMortgage violated sections 275 and 1921 when it filed the certificate of discharge more than 90 days after Nicklaw satisfied his mortgage. It does not allege whether Nicklaw or any other member of the putative class was aware that the certificate of discharge had not been recorded within the statutory time period. It alleges only that the satisfaction of the mortgage was recorded late. CitiMortgage moved to dismiss Nicklaw's second complaint on the ground that the previous dismissal for mootness had preclusive effect.

A magistrate judge recommended the complaint be dismissed based on the earlier ruling on mootness. The district court adopted the report and recommendation of the magistrate judge and dismissed the complaint. After Nicklaw filed this appeal, CitiMortgage moved to dismiss the appeal for lack of jurisdiction.

## II. STANDARD OF REVIEW

**[1]** We review the dismissal of a complaint *de novo. Culverhouse v. Paulson & Co. Inc.,* 813 F.3d 991, 993 (11th Cir. 2016).

## III. DISCUSSION

**[2]   [3]**  Questions of subject matter jurisdiction may be raised at any time. *Ingram v. CSX Transp., Inc.,* 146 F.3d 858, 861 (11th Cir. 1998). Although we ordinarily will not address issues raised for the first time on appeal, "[a]ny time doubt arises as to the existence of federal jurisdiction, we are obliged to address the issue before proceeding further." *Atlanta Gas Light Co. v. Aetna Cas. & Sur. Co.,* 68 F.3d 409, 414 (11th Cir. 1995). This appeal obliges us to consider our jurisdiction.

**[4]   [5]**  The Constitution confers limited authority on the judicial branch. It endows the federal courts with "[t]he judicial Power of the United States," U.S. Const. Art. III § 1, and limits that power to the resolution of "Cases" and "Controversies." *Id.* § 2. "There is no case or controversy, the reasoning has gone, when there are no adverse parties with personal interest in the matter." Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers,* 17 Suffolk U. L. Rev. 881, 882 (1983). And Article III restricts the jurisdiction of the federal courts to litigants who have standing to sue. *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

**[6]   [7]   [8]**  We must determine whether Nicklaw has standing to sue CitiMortgage. The "irreducible constitutional minimum of standing" comprises three elements: injury in fact, causation, and redressability. *Id.* at 560–61, 112 S.Ct. 2130. This bedrock requirement serves many of "the implicit policies embodied in Article III." *Flast v. Cohen,* 392 U.S. 83, 96, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Standing promotes the separation of powers by preventing "overjudicialization of the process of self-governance." Scalia, *The Doctrine of Standing,* **\*1002** *supra,* at 881. It serves judicial efficiency by "prevent[ing] the judicial process from becoming no more than a vehicle for the vindication of the value interests of concerned bystanders." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 687, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). It improves judicial decision making by assuring that the questions presented to the court are resolved in a

concrete factual context. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). And it ensures that "people cannot be intermeddlers trying to protect others who do not want the protection offered." Erwin Chemerinsky, *Federal Jurisdiction* 59 (5th ed. 2007).

**[9]   [10]   [11]**  To determine whether Nicklaw has standing, we must decide whether he alleges an injury in fact. Absent an alleged injury, Nicklaw cannot make out a case or controversy under Article III. A plaintiff has injury in fact if he suffered an invasion of a legally protected interest that is concrete, particularized, and actual or imminent. *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130. "A 'concrete' injury must be '*de facto*'; that is, it must actually exist." *Spokeo, Inc. v. Robins,* ––– U.S. ––––, 136 S.Ct. 1540, 1548, 194 L.Ed.2d 635 (2016). And intangible injuries may satisfy the Article III requirement of concreteness. *Id.* at 1549. For example, a plaintiff who alleges a violation of a statutory right to receive information alleges a concrete injury. *See Fed. Election Comm'n v. Akins,* 524 U.S. 11, 20–25, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998); *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 373–74, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982).

Because Nicklaw alleges only that CitiMortgage violated New York law, we must determine whether the intangible harm caused by the delay in recording the certificate of discharge constitutes a concrete injury in fact. "[B]oth history and the judgment of Congress play important roles" in this analysis. *Spokeo,* 136 S.Ct. at 1549. "[W]hether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts" is instructive because the case-or-controversy requirement is "grounded in historical practice." *Id.* And "Congress may 'elevat[e] to the status of legally cognizable injuries concrete ... injuries that were previously inadequate in law.' " *Id.* (first alteration in original) (quoting *Lujan,* 504 U.S. at 578, 112 S.Ct. 2130); *see also Warth v. Seldin,* 422 U.S. 490, 514, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). But a plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Spokeo,* 136 S.Ct. at 1549.

Nicklaw argues that the intangible harm that occurs when the discharge of a mortgage is not timely recorded

constitutes a concrete injury for two reasons. First, the New York legislature intended to create a substantive right to have the certificate of discharge timely recorded. Second, the right to have a satisfaction of mortgage timely recorded has deep roots in American common law. These arguments fail.

 **[12]**  Nicklaw argues that he has suffered a concrete injury because New York law creates a right to have a certificate of discharge recorded in a timely manner, but the relevant question is whether Nicklaw was harmed when this statutory right was violated. "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* As the Supreme Court explained in the context of the Fair Credit Reporting Act, not all statutory violations "cause harm or present any material **\*1003** risk of harm." *Id.* at 1550. For example, the Court found it "difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm." *Id.* But some inaccuracies, such as incorrectly reporting that an individual has a criminal history, might cause harm or a material risk of harm.

Nicklaw alleges neither a harm nor a material risk of harm that the district court could remedy. His complaint does not allege that he lost money because CitiMortgage failed to file the certificate. It does not allege that his credit suffered. It does not even allege that he or anyone else was aware that the certificate of discharge had not been recorded during the relevant time period. And Nicklaw did not file this action until more than two years *after* CitiMortgage recorded the satisfaction of mortgage. Nicklaw fails to allege even a material risk of harm at this late date.

 **[13]**  That Nicklaw does not allege a sufficient injury in fact under Article III does not mean that New York law does not create a right that, when violated, could form the basis of a cause of action in a court of New York. But Nicklaw chose to sue CitiMortgage in federal court, and the requirement of concreteness under Article III is not satisfied every time a statute creates a legal obligation

and grants a private right of action for its violation. *Id.* A plaintiff must suffer some harm or risk of harm from the statutory violation to invoke the jurisdiction of a federal court.

Nicklaw also argues that the right to have a certificate of discharge timely filed upon satisfaction of a mortgage has deep roots in remedies available at common law, but his argument misapprehends the nature of those remedies. Nicklaw cites decisions of New York courts from the nineteenth century that involved requests to execute and record satisfaction of mortgages that had been paid in full, *see Griswold v. Onondaga Cty. Sav. Bank*, 93 N.Y. 301 (1883); *People ex rel. Adams v. Sigel,* 46 How. Pr. 151 (N.Y. Sup. Ct. 1873), and the common law action of quiet title could be viewed as a precursor to the New York statutes, *see* Note, *Enhancing the Marketability of Land: The Suit to Quiet Title,* 68 Yale L.J. 1245, 1255–76 (1959). But these causes of action provided a remedy to prevent the risk of harm that occurred while title to property was wrongfully clouded, not a remedy *after* the cloud was lifted.

Nicklaw has failed to allege that he sustained a concrete injury. He does not allege that his credit suffered or that he or anyone else knew that the certificate of discharge had not been recorded within the statutory period. By alleging only that CitiMortgage recorded the certificate late and nothing else, Nicklaw has failed to establish that he suffered or could suffer any harm that could constitute a concrete injury. Because Nicklaw lacks standing to sue CitiMortgage, we need not decide whether the earlier order of dismissal as moot bars relitigation of that issue.

### IV. CONCLUSION

We **DISMISS** this appeal for lack of jurisdiction.

**All Citations**

839 F.3d 998, 26 Fla. L. Weekly Fed. C 880

Footnotes

\*      Honorable Roger H. Lawson, Jr., United States District Judge for the Middle District of Georgia, sitting by designation.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.                    5

Lee v. Verizon Communications, Incorporated, 837 F.3d 523 (2016)
Pens. Plan Guide (CCH) P 24019Y

Case: 11-56843  12/01/2016, ID: 10217577, DktEntry: 105, Page 20 of 51

837 F.3d 523
United States Court of Appeals,
Fifth Circuit.

William Lee, Individually, and as Representatives
of plan participants and plan beneficiaries
of the Verizon Management Pension Plan;
Joanne McPartlin, Individually, and as
Representatives of plan participants and plan
beneficiaries of the Verizon Management Pension
Plan; Edward Pundt, Plaintiffs-Appellants
v.
Verizon Communications, Incorporated; Verizon
Corporate Services Group, Incorporated;
Verizon Employee Benefits Committee; Verizon
Investment Management Corporation; Verizon
Management Pension Plan, Defendants-Appellees

No. 14-10553
|
September 15, 2016

**Synopsis**
**Background:** Pension plan participants filed putative class
action against plan sponsors and administrators, alleging
violations of Employee Retirement Income Security Act
(ERISA) as result of decision to amend the defined-
benefit plan by terminating it with respect to retired
participants, but not non-retired participants, through
purchase of insurance-company annuity. Following class
certification, the United States District Court for the
Northern District of Texas, Sidney A. Fitzwater, Chief
Judge, 2014 WL 1407416, dismissed based on failure to
state claim for retired participants, and dismissed for
lack of subject matter jurisdiction the claims for non-
retired participants. Participants appealed. The Court
of Appeals, 623 Fed.Appx. 132, affirmed. The Supreme
Court granted certiorari, vacated the judgment, and
remanded.

**Holdings:** The Court of Appeals, Fortunato P. Benavides,
Circuit Judge, held that:

[1] non-retired participant's allegations did not satisfy
concrete injury requirement for Article III standing;

[2] ERISA required only retrospective notice of plan
amendments;

[3] employer was not acting in fiduciary capacity when it
decided to amend the plan; and

[4] retired participants failed to state a claim for interfering
with attainment of rights.

Affirmed.

West Headnotes (32)

[1]   **Federal Civil Procedure**
      ☞ In general;injury or interest

      Violation of a procedural right granted by
      federal statute may in some circumstances
      be a sufficiently concrete, albeit intangible,
      harm to constitute injury-in-fact, as element
      for Article III standing, without an allegation
      of any additional harm beyond the one
      Congress has identified, but Congress's
      role in identifying and elevating intangible
      harms does not mean that a plaintiff
      automatically satisfies the injury-in-fact
      requirement whenever a statute grants a
      person a statutory right and purports to
      authorize that person to sue to vindicate that
      right; rather, Article III standing requires
      a concrete injury even in the context of a
      statutory violation. U.S. Const. art. 3, § 2, cl.
      1.

      2 Cases that cite this headnote

[2]   **Federal Civil Procedure**
      ☞ In general;injury or interest

      To support Article III standing, a concrete
      intangible injury based on a statutory
      violation must, at minimum, constitute a risk
      of real harm to the plaintiff. U.S. Const. art.
      3, § 2, cl. 1.

      3 Cases that cite this headnote

[3]   **Labor and Employment**

[🖝] **Parties in general;standing**

Bare allegation, by non-retired participant in defined-benefit pension plan for which retirement benefit obligations for retired participants were transferred to insurance-company annuity, of plan sponsors' and administrators' invasion of purported statutory right under ERISA to proper plan management by fiduciaries, without any allegation that non-retired participant's concrete interest in the plan, i.e., his right to payment, was even potentially at risk from the purported statutory deprivation, was insufficient to meet the injury-in-fact prong for Article III standing. U.S. Const. art. 3, § 2, cl. 1; Employee Retirement Income Security Act of 1974 §§ 409, 502(a)(2), 29 U.S.C.A. §§ 1109, 1132(a)(2); 29 C.F.R. § 2510.3-3(d)(2) (ii).

1 Cases that cite this headnote

**[4]**  **Labor and Employment**
      [🖝] **Amount of Benefit and Form of Distribution**

A participant's interest in an ERISA defined-benefit pension plan is his nonforfeitable right only to the defined level of benefits established under the plan. Employee Retirement Income Security Act of 1974 § 2(b), 29 U.S.C.A. § 1001(b).

Cases that cite this headnote

**[5]**  **Federal Courts**
      [🖝] **Pleading**

The Court of Appeals reviews de novo a district court's dismissal for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

Cases that cite this headnote

**[6]**  **Federal Civil Procedure**
      [🖝] **Matters deemed admitted;acceptance as true of allegations in complaint**

Under the plausibility standard for determining whether a complaint states a claim, the court must accept as true all well-pleaded facts. Fed. R. Civ. P. 12(b)(6).

Cases that cite this headnote

**[7]**  **Federal Civil Procedure**
      [🖝] **Insufficiency in general**

     **Federal Civil Procedure**
      [🖝] **Matters deemed admitted;acceptance as true of allegations in complaint**

To survive a motion to dismiss for failure to state a claim, a complaint does not need detailed factual allegations, but must provide the plaintiff's grounds for entitlement to relief, including factual allegations that when assumed to be true raise a right to relief above the speculative level. Fed. R. Civ. P. 12(b)(6).

Cases that cite this headnote

**[8]**  **Federal Courts**
      [🖝] **Jurisdiction**

The Court of Appeals reviews de novo a district court's dismissal for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

Cases that cite this headnote

**[9]**  **Federal Courts**
      [🖝] **Pleadings and motions**

Standing under the civil enforcement provision of ERISA is subject to challenge through a motion to dismiss for lack of subject matter jurisdiction. Employee Retirement Income Security Act of 1974 § 502(a), 29 U.S.C.A. § 1132(a); Fed. R. Civ. P. 12(b)(1).

Cases that cite this headnote

**[10]**  **Federal Courts**
      [🖝] **Pleadings and motions**

     **Federal Courts**
      [🖝] **Presumptions and burden of proof**

Where the movant for dismissal mounts a facial attack on subject matter jurisdiction based only on the allegations in the complaint, the court simply considers the sufficiency of

the allegations in the complaint because they are presumed to be true. Fed. R. Civ. P. 12(b)(1).

Cases that cite this headnote

[11]    **Labor and Employment**
          Amendment or Termination of Plan

        **Labor and Employment**
          Contemplated changes

        ERISA required only retrospective notice of pension plan amendments, and thus, ERISA did not require summary plan description (SPD) to provide notice before adoption of plan amendment under which retirement benefit obligations for retired participants would be transferred to insurance-company annuity. Employee Retirement Income Security Act of 1974, §§ 102(b), 104(b)(1)(B), 29 U.S.C.A. §§ 1022(b), 1024(b)(1)(B); 29 C.F.R. § 2520.102-3(l).

        Cases that cite this headnote

[12]    **Labor and Employment**
          Summary Plan Description

        **Labor and Employment**
          Contemplated changes

        Only disclosure of existing plan terms for the pension plan, and not disclosure of terms that were contingent on a plan amendment, was necessary under ERISA provision requiring summary plan description (SPD) to describe circumstances which might result in disqualification, ineligibility, or denial or loss of benefits, and thus, an SPD which, before amendment, allowed for transfer of retirement benefit obligations only through plan's termination or plan's merger into another pension plan, was not required to address the possibility of plan amendment in which retirement benefit obligations for retired participants were transferred to insurance-company annuity. Employee Retirement Income Security Act of 1974, §§ 102(b), 104(b)(1)(B), 29 U.S.C.A. §§ 1022(b), 1024(b)(1)(B); 29 C.F.R. § 2520.102-3(l).

Cases that cite this headnote

[13]    **Labor and Employment**
          Contemplated changes

        Participant in pension plan, by alleging that pre-amendment summary plan description (SPD) failed to disclose that transfer of retirement benefit obligations to insurance-company annuity, under plan amendment, would not provide protections under ERISA or through Pension Benefit Guaranty Corporation (PBGC), failed to state a claim for violation of ERISA provision requiring an SPD to describe circumstances which might result in loss of benefits. Employee Retirement Income Security Act of 1974, § 102(b), 29 U.S.C.A. § 1022(b); 29 C.F.R. §§ 2510.3–3(d)(2)(ii), 2520.102-3(l).

        Cases that cite this headnote

[14]    **Labor and Employment**
          What Activities Are in Fiduciary Capacity

        The analysis to distinguish between fiduciary and non-fiduciary roles for a person employed to provide services under an ERISA pension plan is a function-centric consideration that is aided by the common law of trusts, which serves as ERISA's backdrop. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104.

        Cases that cite this headnote

[15]    **Labor and Employment**
          What Activities Are in Fiduciary Capacity

        Though an employer may, at different times, wear "hats" as both a sponsor and administrator for a pension plan, fiduciary duties under ERISA are implicated only when it acts in the latter capacity. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104.

        Cases that cite this headnote

**[16]**  **Labor and Employment**
👉 **What Activities Are in Fiduciary Capacity**

Where a claim alleges breach of an ERISA fiduciary duty, the threshold question is whether the person employed to provide services under a pension plan was performing a fiduciary function when taking the action subject to complaint, and in making this threshold evaluation, a person is a fiduciary only to the extent he has, or exercises, specified authority, discretion, or control over a plan or its assets. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104.

Cases that cite this headnote

**[17]**  **Labor and Employment**
👉 **Amendment or termination of plan**

Employer was not acting in a fiduciary capacity, as would be required for retired plan participants' claim for breach of fiduciary duties under ERISA, when employer decided to amend the pension plan by transferring, to an insurance-company annuity, the retirement benefit obligations for retired plan participants, without terminating the plan for non-retired participants; the decision was a settlor function of plan design. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104; 29 C.F.R. § 2510.3-3(d)(2) (ii).

Cases that cite this headnote

**[18]**  **Labor and Employment**
👉 **Amendment or termination of plan as breach of duty**

Employer's decision to amend the ERISA pension plan by transferring to an insurance-company annuity the retirement benefit obligations for retired plan participants, without terminating the plan for non-retired participants, was authorized by an ERISA annuitization regulation, and thus, assuming that employer, in making that decision, was acting as a plan fiduciary, employer did not breach its fiduciary duties under ERISA.

Employee Retirement Income Security Act of 1974, § 404, 29 U.S.C.A. § 1104; 29 C.F.R. § 2510.3-3(d)(2)(ii).

Cases that cite this headnote

**[19]**  **Federal Courts**
👉 **Failure to mention or inadequacy of treatment of error in appellate briefs**

Pension plan participants waived appellate review of the District Court's dismissal, for failure to state a claim, of their claim that ERISA plan fiduciaries breached their fiduciary duties, when implementing plan amendment transferring retirement benefit obligations to insurance-company annuity, because the annuity transaction allegedly underfunded the plan, where participants' appellate brief made only passing reference to underfunding and did not substantively urge the Court of Appeals to review the District Court's dismissal on that ground. Employee Retirement Income Security Act of 1974, § 404, 29 U.S.C.A. § 1104; 29 C.F.R. § 2510.3-3(d)(2)(ii).

Cases that cite this headnote

**[20]**  **Labor and Employment**
👉 **Amendment or termination of plan as breach of duty**

Amendment to pension plan, transferring to an insurance-company annuity the retirement benefit obligations for retired plan participants, without terminating the plan for non-retired participants, did not allow plan to remain obligated for retired participants or to make premium payments that would maintain Pension Benefit Guaranty Corporation (PBGC) protections, and thus, plan fiduciaries, in implementing the plan amendment, did not breach their fiduciary duties under ERISA by failing to hold the annuity contract as a plan asset and failing to maintain PBGC protections; fiduciary duties applied only to decisions over which plan fiduciaries had discretion. Employee Retirement Income Security Act of 1974,

§ 404, 29 U.S.C.A. § 1104; 29 C.F.R. § 2510.3-3(d)(2)(ii).

Cases that cite this headnote

**[21]    Labor and Employment**
        👉 Amendment or termination of plan as breach of duty

Plan fiduciaries for ERISA pension plan did not have a fiduciary duty to obtain the consent of retired plan participants, before employer's decision, as settlor, to amend the plan by transferring to an insurance-company annuity the retirement benefit obligations for retired participants. Employee Retirement Income Security Act of 1974 § 404(a), 29 U.S.C.A. § 1104(a); 29 C.F.R. § 2510.3-3(d)(2)(ii).

Cases that cite this headnote

**[22]    Labor and Employment**
        👉 Amendment or termination of plan as breach of duty

Retired plan participants, by alleging only that plan fiduciaries, in implementing a pension plan amendment transferring retirement benefit obligations for retired participants to an insurance-company annuity, paid $1 billion more than the $7.5 billion in transferred liabilities, without alleging why various enumerated expenses were not reasonable expenses payable by the plan, failed to state a claim under ERISA for breach of fiduciary duty. Employee Retirement Income Security Act of 1974, § 404, 29 U.S.C.A. § 1104; 29 C.F.R. § 2510.3-3(d)(2)(ii).

Cases that cite this headnote

**[23]    Labor and Employment**
        👉 Misrepresentations or omissions in general
        **Labor and Employment**
        👉 Pleading

Retired plan participants, by alleging only that plan fiduciaries, in implementing a pension plan amendment transferring

retirement benefit obligations to an insurance-company annuity, could have avoided "put[ting] all of the Plan's eggs in one basket" if it had not selected one insurer as the sole annuity provider, failed to state a claim under ERISA for breach of fiduciary duty; allegations were conclusory, and they implicated the results of the selection process, and not the conduct of plan fiduciaries. Employee Retirement Income Security Act of 1974, § 404, 29 U.S.C.A. § 1104; 29 C.F.R. § 2510.3-3(d)(2)(ii).

Cases that cite this headnote

**[24]    Labor and Employment**
        👉 Prudent person standard

The test of fiduciary prudence, in selecting an annuity provider when an ERISA pension plan's obligations are transferred to an annuity, is one of conduct, not results, and even where a plan fiduciary's conduct does not meet that standard, ERISA's obligations are nonetheless satisfied if the selected provider would have been chosen had the fiduciary conducted a proper investigation. Employee Retirement Income Security Act of 1974 § 404(a), 29 U.S.C.A. § 1104(a); 29 C.F.R. § 2510.3-3(d)(2)(ii).

Cases that cite this headnote

**[25]    Labor and Employment**
        👉 Motive and intent;pretext

Intent to interfere is a requirement for a violation of the ERISA provision making it lawful to expel a pension plan participant for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan. Employee Retirement Income Security Act of 1974 § 510, 29 U.S.C.A. § 1140.

Cases that cite this headnote

**[26]    Labor and Employment**
        👉 Other particular actions

Retired participants in pension plan, in alleging that plan amendment, transferring retirement benefit obligations to an insurance-company annuity, interfered with their continued participation in the plan and with ERISA and Pension Benefit Guaranty Corporation (PBGC) protections, failed to allege a viable right that was interfered with, as would be required to state a claim for violating ERISA by expelling a plan participant for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan. Employee Retirement Income Security Act of 1974 § 510, 29 U.S.C.A. § 1140; 29 C.F.R. § 2510.3-3(d)(2)(ii).

Cases that cite this headnote

**[27]  Federal Courts**
👍 Necessity of Objection;Power and Duty of Court

The requirement that subject matter jurisdiction be established as a threshold matter is inflexible and without exception.

Cases that cite this headnote

**[28]  Federal Civil Procedure**
👍 In general;injury or interest

**Federal Civil Procedure**
👍 Causation;redressability

In order to establish the irreducible, constitutional minimum of Article III standing, a plaintiff must show: (1) an injury in fact; (2) a sufficient causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision. U.S. Const. art. 3, § 2, cl. 1.

Cases that cite this headnote

**[29]  Federal Civil Procedure**
👍 In general;injury or interest

Injury in fact, as element for Article III standing, requires that the plaintiff have a personal stake in the outcome of the

controversy, such that the injury is concrete and particularized, and actual or imminent, not conjectural or hypothetical. U.S. Const. art. 3, § 2, cl. 1.

Cases that cite this headnote

**[30]  Federal Civil Procedure**
👍 In general;injury or interest

An allegation of future injury may satisfy the injury-in-fact element for Article III standing, if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur. U.S. Const. art. 3, § 2, cl. 1.

Cases that cite this headnote

**[31]  Labor and Employment**
👍 Parties in general;standing

Allegation of non-retired participant in defined-benefit pension plan for which retirement benefit obligations for retired participants were transferred to insurance-company annuity, that plan was underfunded after the transfer, was too speculative regarding realization of risks which would create likelihood of direct injury to non-retired participant's benefits, as would support the injury-in-fact element for Article III standing to bring suit under ERISA against plan sponsor and administrators. U.S. Const. art. 3, § 2, cl. 1; Employee Retirement Income Security Act of 1974 §§ 409, 502(a)(2), 29 U.S.C.A. §§ 1109, 1132(a)(2); 29 C.F.R. § 2510.3-3(d)(2)(ii).

Cases that cite this headnote

**[32]  Labor and Employment**
👍 Parties in general;standing

Alleged injury to defined-benefit pension plan, after plan amendment that transferred to insurance-company annuity the retirement benefits obligations for retired plan participants but not for non-retired participants, did not satisfy the injury-in-fact requirement for the Article III standing of a non-retired participant to bring suit under

ERISA, in a quasi-representative capacity, against plan sponsor and administrators. U.S. Const. art. 3, § 2, cl. 1; Employee Retirement Income Security Act of 1974 §§ 409, 502(a)(2), 29 U.S.C.A. §§ 1109, 1132(a)(2); 29 C.F.R. § 2510.3-3(d)(2)(ii).

Cases that cite this headnote

**\*528** Appeal from the United States District Court for the Northern District of Texas

**Attorneys and Law Firms**

Curtis L. Kennedy, Denver, CO, Robert E. Goodman, Jr., Esq., Kilgore & Kilgore, P.L.L.C., Dallas, TX, Karen L. Handorf, Esq., Michelle C. Yau, Cohen Milstein Sellers & Toll, P.L.L.C., Washington, DC, for Plaintiffs-Appellants.

Christian James Pistilli, Thomas Leon Cubbage, III, Jeffrey George Huvelle, Covington & Burling, L.L.P., Washington, DC, for Defendants-Appellees.

Before BENAVIDES, SOUTHWICK, and COSTA, Circuit Judges.

### ON REMAND FROM THE UNITED STATES SUPREME COURT

FORTUNATO P. BENAVIDES, Circuit Judge:

This court previously affirmed the dismissal of Plaintiffs-Appellants' claims against Defendants-Appellees for violations of The Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461 ("ERISA"). *See Lee v. Verizon Commc'ns, Inc.*, 623 Fed.Appx. 132, 134 (5th Cir. 2015) (unpublished). Our affirmance **\*529** was driven, in part, by the determination that Plaintiff-Appellant Edward Pundt ("Pundt"), representative of one of the two certified classes of Verizon pension-plan participants, lacked Article III standing to sue for purported fiduciary misconduct pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a). *Id.* at 147. Specifically, we held that "standing for defined-benefit plan participants requires imminent risk of default by the plan, such that the participant's benefits are adversely affected," and we noted that Pundt failed to "allege the realization

of risks which would create a likelihood of direct injury to participants' benefits" in this case. *Id.* at 148–49. We thus concluded that any direct harm to Pundt was "too speculative to support standing." *Id.* at 149. We also rejected Pundt's argument that "he directly suffered constitutionally cognizable injury through invasion of his ... statutory rights [under ERISA] to proper [p]lan management," concluding that standing based on invasion of a statutory right must still "aris[e] from *de facto* injury, which is not alleged by a breach of fiduciary duty." *Id.*

Pundt filed a petition for writ of certiorari in the United States Supreme Court. The Supreme Court subsequently decided *Spokeo, Inc. v. Robins*, ──U.S. ──, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016), which clarified the relationship between concrete harm and statutory violations for purposes of assessing Article III standing. After deciding *Spokeo*, the Supreme Court granted Pundt's petition for writ of certiorari, vacated our judgment in this case, and remanded the case to this court for further consideration in light of *Spokeo*. *Pundt v. Verizon Commc'ns, Inc.*, ── U.S. ──, 136 S.Ct. 2448, 195 L.Ed.2d 260 (2016). We requested and received supplemental briefing from both sides regarding the impact of *Spokeo*.

There is only one narrow question for us to consider on remand: namely, whether *Spokeo* affects our previous conclusion that a plaintiff's bare allegation of incursion on the purported statutory right to "proper plan management" under ERISA is insufficient to meet the injury-in-fact prong of Article III standing. We believe this conclusion remains as valid in light of *Spokeo* as it was before *Spokeo* was decided.

**[1]** **[2]** The Supreme Court reaffirmed in *Spokeo* that violation of a procedural right granted by statute may in some circumstances be a sufficiently concrete, albeit intangible, harm to constitute injury-in-fact without an allegation of "any *additional* harm beyond the one Congress has identified." 136 S.Ct. at 1549. However, the Supreme Court also took care to note that "Congress'[s] role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* Rather, "Article III standing requires a concrete injury even in the context of a

statutory violation." *Id.* Put differently, the deprivation of a right created by statute must be accompanied by "some concrete interest that is affected by the deprivation." *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009)). Thus, *Spokeo* recognizes that at minimum, a "concrete" intangible injury based on a statutory violation must constitute a "risk of real harm" to the plaintiff. *Id.*

[3] *Spokeo* maps surprisingly well onto the present case: in *Spokeo*, the Supreme Court held that a bare allegation of a Fair Credit Reporting Act violation based on inaccurate reporting of consumer information was insufficient to establish injury-in-fact, as "not all inaccuracies cause harm or **\*530** present any material risk of harm." *Id.* at 1550. In the same way, we recognized in this case that Pundt's allegation of an "invasion of [a] statutory right[ ] to proper [p]lan management" under ERISA was not alone sufficient to create standing where there was no allegation of a real risk that Pundt's defined-benefit-plan payments would be affected. In short, because Pundt's "concrete interest" in the plan—his right to payment— was not alleged to be at risk from the purported statutory deprivation, Pundt had not suffered an injury that was sufficiently "concrete" to confer standing. We declined to hold that the mere allegation of fiduciary misconduct in violation of ERISA, divorced from any allegation of risk to defined-benefit-plan participants' actual benefits, could constitute *de facto* injury sufficient to establish constitutional standing.

Pundt argues on remand that *Spokeo* requires consideration of historical practice in determining whether an intangible harm constitutes injury-in-fact, *Id.* at 1549, and thus this court should find that Pundt has standing based on common-law trust principles. However, *Spokeo*'s recognition of history as an important consideration in Article III standing analysis is not new. Indeed, the Supreme Court has "often said that history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 274, 128 S.Ct. 2531, 171 L.Ed.2d 424 (2008). In other words, the Supreme Court's view that history can provide a useful metric for identifying intangible harms was "often" invoked prior to *Spokeo*, yet Pundt failed to raise his trust-law theory in the district court and did not press it in his opening brief to this court beyond making a passing reference to "historical authorities." *Spokeo* thus

gives us no occasion to revisit an issue that Pundt did not adequately raise and that *Spokeo* did not affect, and we reject Pundt's statutory-injury argument for the same reason we identified in our original opinion: a *de facto* injury is not alleged by reference to fiduciary misconduct under ERISA alone. *See David v. Alphin*, 704 F.3d 327, 336–37 (4th Cir. 2013) (rejecting trust-law argument and concluding that defined-benefit-plan participants lacked Article III standing to sue based solely on deprivation of statutory right).

[4] Pundt also contends that the judgment of Congress supports finding standing in this case, as Congress's expressed concern in enacting ERISA was to protect "the interests of participants in employee benefit plans...." 29 U.S.C. § 1001(b). As we explained in our original opinion, however, a defined-benefit-plan participant's "interest[ ]" in the plan is his "nonforfeitable right only to" the "defined level of benefits" established under the plan. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 440, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999). We once again decline to "conflat[e] the concepts of statutory and constitutional standing" by holding that incursion on a statutorily-conferred interest in "proper plan management" is sufficient in itself to establish Article III standing. *Lee*, 623 Fed.Appx. at 149. A bare allegation of improper defined-benefit-plan management under ERISA, without concomitant allegations that any defined benefits are even potentially at risk, does not meet the dictates of Article III; concluding otherwise would vitiate the Supreme Court's explicit pronouncement that "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo*, at 1549; *see also Kendall v. Emps. Ret. Plan of Avon Prods.*, 561 F.3d 112, 120 (2d Cir. 2009) ("The statute does impose a general fiduciary duty to comply with ERISA, but it does not confer a right to every plan participant to sue the plan fiduciary **\*531** for alleged ERISA violations without a showing that they were injured by the alleged breach of the duty."), *abrogated in part on other grounds as recognized in Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016); *Fletcher v. Convergex Grp. LLC*, 164 F. Supp. 3d 588, 591, No. 13–CV–9150, 2016 WL 690889, at \*3 (S.D.N.Y Feb. 17, 2016) (noting that *Kendall* "firmly rejected [the] argument that defendants' violation of their statutory duties under ERISA is in and of itself an injury in fact to [the plaintiff]").

Having addressed the only issue that is even arguably implicated by *Spokeo*, we need not consider the remaining arguments raised by Pundt on remand. To the extent Pundt advances a distinct theory of standing based on the pursuit of injunctive relief, that argument has been waived. *See United States v. McRae*, 795 F.3d 471, 479 (5th Cir. 2015) ("[A]n argument not raised at the district court or in the appellant's opening brief is waived...."). We accordingly reinstate and publish our prior opinion, which we reproduce below.

\* \* \* \* \*

Before the court is a retirement-plan dispute brought by current and former participants and beneficiaries of Verizon's pension plan ("the Plan"). Plaintiffs, representing two certified classes, allege violations under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA"), by the pension plan sponsors and administrators as a result of a plan amendment and subsequent annuity purchase in December of 2012. The certified classes are distinguished by the annuity transaction, which transferred benefit obligations for some Plan beneficiaries to a group insurance annuity, resulting in the following classes: the Transferee Class, represented by Plaintiffs William Lee and Joanne McPartlin (collectively, "Transferee Class representatives"), comprising Plan participants whose retirement-benefit obligations were transferred to the annuity; and the Non-Transferee Class, represented by Plaintiff Edward Pundt ("Pundt"), comprising Plan participants whose retirement-benefit obligations remained with the Plan. Plaintiffs appeal the district court's dismissal of the claims of the Transferee Class for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), as well as the dismissal of the sole claim of the Non-Transferee Class under Rule 12(b)(1) for lack of constitutional standing.

We affirm.

### I. BACKGROUND

#### A. Factual History

Unless otherwise noted, the following factual history is based on Appellants' allegations in the second amended complaint ("SAC"), the live pleading at the time of the district court's dismissal order.

In August of 2012, Verizon Investment Management Corp. ("VIMCO"), a wholly-owned subsidiary of Verizon Communications Inc. ("Verizon"), retained Fiduciary Counselors, Inc. ("FCI or Independent Fiduciary") as an independent fiduciary to "represent the participants and beneficiaries in connection with the selection of the insurance company (or insurance companies) to provide an annuity" and to negotiate "the terms of the annuity contract or contracts." On or about September 8, 2012, over a month prior to the date of the amendment, the Independent Fiduciary provided a written determination of the transaction's compliance with ERISA.

In October of 2012, Verizon's board of directors amended the Plan terms to provide for an annuity transaction, effective December 7, 2012. The amendment applied **\*532** to Plan participants who were already receiving benefit payments as of January 1, 2010; this effectively divided the Plan participants into the 41,000 members of the Transferee Class, and the roughly 50,000 members of the Non-Transferee Class. Regarding payments to those retirees, the amendment directed the Plan to purchase an annuity meeting the following requirements: (1) guaranteeing payment of pension benefits for all transferred Plan participants; (2) maintaining benefit payments in the same form that was in effect at the time of the annuity transaction; and (3) relieving the Plan of any benefit obligation for any transferred Plan participants. [1]

Also in October of 2012, Verizon entered into a definitive purchase agreement with Prudential, VIMCO, and FCI. Under the terms of the agreement, Verizon would purchase a single-premium, group annuity contract from Prudential for $8.4 billion, in settlement of $7.4 billion in Plan benefit obligations. Plan fiduciaries notified members of the Transferee Class about the annuity transaction.

Shortly after Plaintiffs' motion for preliminary injunction against the annuity transaction was denied, the annuity parties consummated the annuity transaction on December 10, 2012.

#### B. Procedural History

The Transferee Class representatives filed their original complaint on November 27, 2012; the complaint was immediately followed by their application for a temporary

Lee v. Verizon Communications Incorporated, 837 F.3d 523 (2016)
Pens. Plan Guide (CCH) P 24019Y

Case: 11-56843, 12/01/2016, ID: 10217577, DktEntry: 105, Page 29 of 51

restraining order. [2] In an order dated December 7, 2012 ("*Lee I*"), the district court denied the application. [3] On January 25, 2013, the Transferee Class representatives filed their first amended complaint, to which Plaintiff Pundt joined, and the district court certified the classes on March 28, 2013.

In an order dated June 24, 2013 ("*Lee II*"), the district court granted Defendants' motion to dismiss the Transferee Class's claims for failure to state a claim under Rule 12(b)(6), and the Non-Transferee Class's claim under Rule 12(b)(1) for lack of constitutional standing. [4] The court also granted Plaintiffs leave to amend. [5]

Plaintiffs filed the SAC on July 12, 2013. [6] In an order dated April 11, 2014 ("*Lee III*"), the district court dismissed the SAC in its entirety for failing to cure the **\*533** deficiencies identified in *Lee II*. [7] Specifically, the district court reasoned that, as amended, the first and third claims of the Transferee Class, as well as the claim of the Non-Transferee Class, warranted dismissal for the reasons stated in *Lee II*; [8] the district court then more fully addressed the amended allegations regarding the Transferee Class's second claim before dismissing that claim as well. [9]

## II. DISCUSSION

### A. Standard of Review

[5] [6] [7] This court reviews *de novo* a district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). [10] In doing so, the court applies the familiar *Twombly*-plausibility standard, according to which "we must accept as true all well-pleaded facts." [11] "To survive a Rule 12(b)(6) motion to dismiss, a complaint does not need detailed factual allegations, but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true raise a right to relief above the speculative level." [12]

[8] [9] [10] The court similarly evaluates the Rule-12(b)(1) dismissal of the claim by the Non-Transferee Class for lack of standing. As with a 12(b)(6) dismissal, this court reviews *de novo* a district court's dismissal under 12(b)(1). [13] As a matter of subject matter jurisdiction, [14] standing under ERISA § 502(a) is subject to challenge

through Rule 12(b)(1). [15] Where, as here, the movant mounts a "facial attack" on jurisdiction based only on the allegations in the complaint, the court simply considers "the sufficiency of the allegations in the complaint because they are presumed to be true." [16]

### B. Duty to Disclose under ERISA § 102(b), 29 U.S.C. § 1022(b)

[11] The Transferee Class first asserts that that the Plan fiduciaries breached their fiduciary duties under ERISA by failing to disclose the annuity transaction's effect on payor responsibilities and participant enrollment in the Plan. At the outset, the following is undisputed: (1) the Plan provided Summary Plan Descriptions ("SPDs"); (2) the Plan fiduciaries promptly disclosed the amendment shortly after its adoption; and (3) the annuity transaction did not change the form or amount of benefits. However, Plaintiffs argue that the pre-amendment SPDs were insufficient because they did not give notice of the annuity transaction.

**\*534** ERISA § 102(b) requires an SPD to describe "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." [17] In turn, the pertinent regulation promulgated by the Department of Labor ("DOL") requires an SPD to describe "circumstances which may result in ... loss[ ] ... of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide." [18] Appellants first argue that the Verizon Employee Benefits Committee ("VEBC"), a Verizon plan fiduciary, failed to provide compliant SPDs by not disclosing the possibility that benefit obligations could be transferred to an insurance-company annuity absent a plan termination or spin-off/merger. As explained below, this argument lacks merit in light of this court's precedent, which holds that ERISA does not require SPDs to describe future terms, and statutory language requiring only retrospective notice of plan amendments.

[12] First, as Appellees note, we have previously interpreted ERISA disclosure requirements as only extending to current aspects of the plan, and to the exclusion of potential changes which are contingent upon a plan amendment. In *Wise v. El Paso Natural Gas Co.*, [19] this court held that "Section 1022(b) relates to an individual employee's eligibility under then existing,

current terms of the Plan and not to the possibility that those terms might later be changed, as ERISA undeniably permits." [20] The decisions cited by Appellants do not vitiate this principle, as both decisions addressed the disclosure of existing plan terms, not potential, amendment-contingent terms. [21] In this case, prior to the October-2012 amendment directing the annuity purchase, the Plan only allowed for the transfer of benefit obligations through the Plan's termination or merger into another pension plan; SPDs issued prior to the amendment were only required to address those circumstances.

Further, it is undisputed that the Plan fiduciaries provided notice shortly after the amendment's adoption, well within the time limits imposed for notice of plan amendment. ERISA only requires that administrators provide a summary description of any material modification or change "not later than 210 days after the end of the plan year in which the change is adopted." [22] In keeping with this language, we previously held in *Martinez v. Schlumberger, Ltd.* [23] that, within the context of ERISA disclosure requirements, there is no employer duty "to affirmatively disclose whether it is considering amending its benefit plan." [24] Appellees also correctly note that the pre-amendment SPDs advised participants of Verizon's reservation of the right to amend the Plan, and the possibility that an amendment might affect their rights under the Plan.

[13] As a second basis for violation, the Transferee Class alleges that the pre-amendment SPDs failed to advise of the possible "loss of benefits." The district court rejected this claim because the Transferee Class failed to allege a change in the amount of benefits they would receive. On appeal, the Transferee Class acknowledges **\*535** that the amount of benefits remains unchanged under the terms of the annuity contract. However, the Transferee Class also asserts that the phrase "loss of benefits" encompasses federal protections under ERISA and the Pension Benefit Guaranty Corporation ("PBGC"). [25] Appellants, however, provide no authority supporting the inclusion of ERISA and PBGC protections as "benefits" within the meaning of § 102. Countenancing against Appellants' argument, this interpretation of "benefits" is more expansive than the ERISA regulation governing the purchase of annuities by plan fiduciaries ("Annuitization Regulation"), which requires that such transactions

guarantee a participant's "entire benefit rights." [26] As discussed further below, the annuity agreement does not guarantee ERISA and PBGC protections, but Appellants do not dispute that the transaction complies with the Annuitization Regulation's guarantee requirement.

Accordingly, we find no error in the district court's dismissal of the Transferee Class's claim under ERISA § 102.

### C. Fiduciary Duties under ERISA § 404(a)(1), 29 U.S.C. § 1104

The Transferee Class asserts several breaches of fiduciary duties under ERISA § 404(a)(1)(A), which requires that plan fiduciaries use plan assets "for the exclusive purpose of[ ] ... providing benefits" and "defraying reasonable expenses of administering the plan." [27] In doing so, a fiduciary must act "solely in the interest of [plan] participants," [28] and employ the "care, skill, prudence, and diligence" of a "prudent man" acting in like circumstances. [29] Section 8.5 of the Plan mirrors that of § 404, requiring that assets of the Plan be used "for the exclusive benefit of [participants and beneficiaries] and shall be used to provide benefits under the Plan and to pay the reasonable expenses of administering the Plan and the Pension Fund, except to the extent that such expenses are paid by [Verizon]." [30]

[14] [15] [16] *Fiduciary vs. Non-Fiduciary Functions.* First, it behooves the analysis to distinguish between fiduciary and non-fiduciary roles, a function-centric consideration "that is aided by the common law of trusts which serves as ERISA's backdrop." [31] Further, though an employer may, at different times, wear "hats" as both a sponsor and administrator, [32] "fiduciary duties under ERISA are implicated only when it acts in the latter capacity." [33] Thus, where a claim alleges breach of an ERISA fiduciary duty, the threshold question is whether the "person employed to provide services under a plan ... was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." [34] In making this threshold evaluation, "[a] person is a fiduciary only to the extent he has or exercises specified authority, discretion, or control over a plan or its assets." [35]

**\*536** In contrast, we have previously held that actions by a plan sponsor "to modify, amend or terminate the plan" are outside the scope of fiduciary duties; "such decisions are those of a trust settlor, not a fiduciary." [36] In *Hughes Aircraft Co. v. Jacobson*, the Supreme Court noted that, "[i]n general, an employer's decision to amend a pension plan concerns the composition or design of the plan itself and does not implicate the employer's fiduciary duties which consist of such actions as the administration of the plan's assets," as well as decisions "regarding the form or structure of the Plan...." [37] The *Jacobson* Court emphatically concluded that "without exception, plan sponsors who alter the terms of a plan do not fall into the category of fiduciaries." [38]

Courts have drawn a distinction between decisions to alter a plan, and the implementation of those decisions. For example, in *Beck v. PACE Intern. Union*, the Court noted the distinction between whether to terminate a plan through an annuity purchase, and the fiduciary obligation in its selection of an annuity provider. [39] Appellees rely in part upon *Beck* to support two sponsor-fiduciary distinctions, distinctions which are disputed by Appellants but which affect multiple issues.

*Beck* involved an employer's filling dual roles as plan sponsor and administrator, and the Court considered the question of whether a plan sponsor's choice of plan termination through the purchase an annuity, rather than merger with another pension plan, constituted a decision as a plan sponsor or fiduciary. [40] The *Beck* Court first noted the general principle that an employer's decisions regarding the form or structure of a plan are immune from ERISA's fiduciary obligations, and that these decisions include termination and (in most cases) merger. [41] Recognizing that ERISA imposed fiduciary obligations on the method of termination, *e.g.* the fiduciary obligation on selecting an annuity provider, the *Beck* Court acknowledged that the choice between possible methods of termination, *i.e.* annuitization or merger, created a plausible basis to consider merger as a fiduciary action within that context. [42] Ultimately, *Beck* did not reach ERISA's fiduciary application to merger, as the Court determined merger was not a permissible method of termination under ERISA. [43]

[17] Appellees first cite *Beck* in support of the proposition that the decision to enter into an annuity is a sponsor decision immune from ERISA's fiduciary obligations. In turn, Appellants argue that *Beck* is inapposite as it analyzed a plan termination, rather than an ongoing plan. This distinction does not vitiate *Beck*'s application to the instant circumstances. The *Beck* Court broadly described decisions regarding the **\*537** the form and structure of a plan as those of a plan sponsor, and its primary focus on one type of sponsor decision does not undercut the application to other sponsor decisions regarding a plan's form and structure. Accordingly, we hold the annuity amendment was a sponsor function of plan design, authorized under ERISA through the Annuitization Regulation.

Appellees also cite *Beck* for the principle that an employer's decision to maintain or remove pension liabilities is a design decision and settlor function. In deciding that merger was not a permissible form of termination, the *Beck* Court compared the effect of annuity purchases and merger, emphasizing that the latter "represents a *continuation* rather than a *cessation* of the ERISA regime." [44] Despite discussing the annuity purchase's effect of "formally sever[ing] the applicability of ERISA to plan assets and employer obligations" (including the employer's release from ERISA's requirement to make PBGC premium payments), the *Beck* Court did not impute fiduciary aspects to the sponsor's decision to sever ERISA's applicability. [45] Consistent with *Beck*, therefore, we consider the decision to transfer pension assets outside ERISA coverage as a sponsor decision immune from fiduciary obligations.

Also relating to the sponsor-fiduciary distinction, Appellants assert that the district court mischaracterized some of their claims as asserted against Verizon and the Plan fiduciaries, VIMCO and VEBC. In Appellants' view, the claim was asserted only against the Plan fiduciaries, and the district court's considering the claim as asserted against Verizon was questionable. However, regarding some of the alleged bases for fiduciary breach, the allegations in the SAC implicate the act of amending the Plan to direct the annuity purchase, an act by Verizon as settlor, as well as the acts involved in implementing the annuity purchase, which involve functions of the Plan fiduciaries. As a result, we hold the district court properly addressed Verizon's role as sponsor, before addressing the implementation of the transaction involving VIMCO

and VEBC. We separately consider these alleged breaches below.

### 1. Alleged Breach by Plan Sponsor

[18] Appellants first assert that Verizon breached its fiduciary duty by entering into the annuity transaction, which resulted in the partial transfer of pension obligation from an ongoing Plan. Because such a transfer during an ongoing plan is not expressly authorized by an ERISA provision or regulation, Appellants posit that Verizon's decision was subject to ERISA's fiduciary duty provisions. This argument lacks merit for several reasons: (1) precedent suggests that the amendment was a settlor function; (2) ERISA and related regulations authorize annuity purchases, and do not prohibit such purchases during an ongoing plan; and (3) even assuming ERISA prohibits annuity purchases during an ongoing plan, Appellants cite no authority that the prohibition's violation would subject an otherwise settlor function to fiduciary requirements.

First, the precedent cited above describes the decision to amend a pension plan concerning the composition or design of the plan as a settlor function, immune from fiduciary strictures. Accordingly, the decision to amend the Plan and transfer assets into an annuity was made solely by Verizon in its settlor capacity. Appellants' argument against this principle, broadly that any action which disposes of plan **538** assets creates fiduciary obligations, is not supported by any authority. The *Beck* Court tangentially addressed Appellants' argument, noting that "[t]he purchase of an annuity is akin to a transfer of assets and liability (to an insurance company)" yet maintaining its position that a decision to enter into an annuity (albeit during a plan termination) was a settlor function.[46]

Secondly, Appellants do not proffer any authority that would prohibit the transfer from an ongoing plan via an annuity transaction. At the same time, Appellees respond with ERISA provisions and regulations which suggest such transactions are authorized, and at least are not foreclosed.

In the first instance, ERISA provisions, as well as regulations promulgated by the Department of Labor, set forth several mechanisms by which an employer may remove liabilities from a pension plan, one of which is through transfer to an insurance company by an annuity purchase.[47] Upon transfer via annuity purchase, an individual is no longer "a participant covered under an employee pension plan or a beneficiary receiving benefits under an employee pension plan," so long as the individual's entire benefit rights are (1) guaranteed by the insurance company; (2) enforceable against the insurance company at the sole choice of the individual; and (3) the individual is issued notice of the benefits to which he or she is entitled under the plan.[48] Appellants do not dispute that the annuity transaction complied with these requirements, transferring the entire benefit rights of the Transferee Class and satisfying the three requirements for removal from the Plan.

Regarding the ability of a plan sponsor to perform an annuity transfer *during an ongoing plan*, neither ERISA itself nor the regulations promulgated thereunder speak directly to this point. However, a Department of Labor interpretive bulletin describes circumstances in which a pension plan might purchase annuity contracts, and notes that "*in the case of an ongoing plan*, annuities might be purchased for participants who are retiring or separating from service with accrued vested benefits."[49] Although the bulletin does not specifically describe this circumstance, the bulletin describes potential circumstances non-exclusively, suggesting that such transfers are permitted, especially when considered in conjunction with the annuity-transfer regulation.

Finally, even assuming *arguendo* that ERISA prohibits annuity purchases during ongoing plans, Appellants cite no authority which would make the amendment a fiduciary function due to violation of that prohibition. In light of the above considerations, we hold that the transfer of pension liabilities from an ongoing plan through an annuity transaction amendment is a settlor function, permitted under ERISA, or, alternatively, that such transactions are not subject to fiduciary duty requirements.

### *539 2. Alleged Breaches by Plan Fiduciaries

[19] The Transferee Class also alleges breach of fiduciary duty in the implementation of the amendment. In this regard, the Transferee Class asserts several grounds,

Lee v. Verizon Communications Incorporated, 837 F.3d 523 (2016)
Pens. Plan Guide (CCH) P 24019Y

Case: 11-56843, 12/01/2016, ID: 10217577, DktEntry: 105, Page 33 of 51

alleging that Plan fiduciaries (1) failed to hold the annuity contract as a Plan asset; (2) failed to obtain consent of the Transferee Class members; (3) failed to communicate with the Transferee Class members prior to the annuity transaction; (4) violated the terms of § 8.5 of the Plan; and (5) failed to select more than one annuity provider. [50] We consider these breaches *seriatim*.

 **[20]** *Failure to Hold Annuity Contract within Plan as Plan Asset*. The Transferee Class maintains that Plan beneficiaries should have held the annuity contract as a Plan asset ("internal annuity"), and that such an arrangement would have maintained ERISA and PBGC protections for the benefit of the class members.

However, as the district court reasoned, the plan amendment did not allow for the Plan to remain obligated for the benefit of the Transferee Class. As noted above, the Plan fiduciaries are only responsible for decisions over which they have discretion. Although disputed by Appellants, the terms of the amendment clearly provide that the Plan will have no obligation to make any payment for the pension benefits of the Transferee Class after the annuity transaction. Within the strictures of the amendment terms, Plan fiduciaries were without discretion to maintain pension obligations of the Transferee Class within the Plan. [51]

 **[21]** *Failure to Obtain Transferee Consent*. The Transferee Class also asserts that the Plan fiduciaries should have obtained the consent of the Transferee Class members before transferring the pension obligations to the annuity contract. In the first instance and as the district court noted, the determination to transfer assets to an annuity was a decision made by Verizon as settlor, and does not fall within the scope of its fiduciary duties. In *Hughes Aircraft Co. v. Jacobson*, the Supreme Court held that three fiduciary claims were foreclosed because "without exception, plan sponsors who alter the terms of a plan do not fall into the category of fiduciaries." [52] The Eighth Circuit decision in *Howe v. Varity Corp.*, [53] a pre-*Jacobson* decision to which Appellants cite for the consent requirement, does not succeed in imputing fiduciary obligations to an action **\*540** which the Supreme Court has deemed immune from those obligations. We further note that Appellants' position is neither supported by the terms of ERISA, which itself contains no such requirement for consent, either in the provisions detailing

fiduciary duties, [54] or in the provisions governing ERISA-compliant annuity purchases. [55]

*Failure to Communicate with Transferees*. The Transferee Class also asserts that Plan fiduciaries breached their duty by not communicating with beneficiaries. Although the Transferee Class asserts that "ERISA and its accompanying regulations" require such communication, the Transferee Class does not cite any actual ERISA provisions, and only cites to the Ninth Circuit decision of *Booton v. Lockheed Med. Benefit Plan*, an inapposite opinion which discussed the ERISA-required documentation following the denial of benefits. [56] Although the Annuity Regulation does require that participants receive notice of the terms of the benefits to which they are entitled as part of the annuity transaction, [57] it is undisputed that the Transferee Class received this notice. After the annuity transaction, the benefits are no longer governed by ERISA, and any nondisclosure does not give rise to a cognizable action. [58]

 **[22]** *Expenses of Annuity Transaction*. As part of the annuity transaction, it is undisputed that Verizon paid Prudential a total of $8.4 billion, $1 billion more than the amount of the transferred liabilities. The Transferee Class alleges that Verizon violated § 8.5 of the Plan, requiring that Plan assets be used for the exclusive benefit of Plan beneficiaries and participants, as well as reasonable expenses of administering the Plan and Pension Fund. In the SAC, the Transferee Class alleges as follows:

> However, almost $1 billion more than necessary to cover the transferred liabilities was paid by Prudential by the Plan for amounts other than benefits and reasonable expenses of administering the Plan. The extra $1 billion payment was applied toward expenses, not for administering the ongoing Plan, but to enable avoidance of payment of such expenses by the Plan sponsor, [Verizon], thus violating Section 8.5.... [59]

> The extra $1 billion payment was used to pay Verizon's-the settlor's obligations for third-party costs related to the annuity transaction, including fees paid to outside lawyers, accountants, actuaries, financial consultants and brokers. Those expenses and fees should have been charged to Verizon's corporate operating revenues, not charged to the Plan and Master Trust. [60]

Lee v. Verizon Communications Incorporated, 837 F.3d 523 (2016)
Pens. Plan Guide (CCH) P 24019Y

Case: 11-56843    12/01/2016    ID: 10217577    DktEntry: 105    Page 34 of 51

The district court ruled that these allegations failed to state a claim by not specifying "which aspects of the extra $1 billion of expenditures were unreasonable, or how they were unreasonable." [61] The Transferee Class argues that the district court's reasonableness analysis is misplaced, and that **\*541** the proper inquiry is whether the additional $1 billion in administrative costs was a settlor cost which was wrongfully paid from Plan assets, constituting a fiduciary breach. The Transferee Class supports their position by citing to a Department of Labor advisory opinion discussing plan-related expenses for which a settlor is responsible. The advisory opinion provides:

> Expenses incurred in connection with the performance of settlor functions would not be reasonable expenses of a plan as they would be incurred for the benefit of the employer and would involve services for which an employer could reasonably be expected to bear the cost in the normal course of its business operations. *However, reasonable expenses incurred in connection with the implementation of a settlor decision would generally be payable by the plan.* [62]

Appellants quote the first portion, but omit the italicized portion of the advisory opinion from their brief. [63] The effect of the advisory opinion, upon which Appellants otherwise rely, is two-fold. First, by contemplating that expenses implementing a settlor decision, such as an amendment and restructuring of a plan, are payable by the plan, the advisory opinion refutes Appellants' argument that expenditures not associated with plan administration are unreasonable. Second, since implementation expenses by the plan are permitted to the degree they are reasonable, the advisory opinion focuses the critical inquiry on the reasonableness of the expenses.

In light of the foregoing, reasonableness of the expenses must be addressed by the Transferee Class's allegations. Here, although the allegations enumerate various expenses associated with the implementation of Verizon's decision as settlor, they wholly fail to address how those expenses are not reasonable expenses which are payable by the plan. To be sure, $1 billion in

expenses is a large sum but, in light of the $7.5 billion in attendant obligations, we will not conclude that this allegation alone is sufficient to support unreasonableness under our pleading standards. In light of the threadbare allegations, along with the size and complexity of the annuity transaction, we agree with the district court's dismissal of this ground as insufficiently supported.

**[23]    [24]** <u>*Failure to Select Multiple Annuity Providers*</u>. The Transferee Class further alleges a breach of fiduciary duty by selecting Prudential as the sole annuity provider. Regarding the selection of an annuity provider, this court described the relevant inquiry in *Bussian v. RJR Nabisco, Inc.*, as follows:

> [W]hether the fiduciary, in structuring and conducting a thorough and impartial investigation of annuity providers, carefully considered [the factors enumerated in the Department of Labor Interpretive Bulletin 95-1] and any others relevant under the particular circumstances it faced at the time of decision. If so, a fiduciary satisfies ERISA's obligations if, based upon what it learns in its investigation, it selects an annuity provider it "reasonably concludes best to promote the interests of [the plan's] participants and beneficiaries." [64]

In a later decision, we clarified that the test of fiduciary prudence "is one of conduct, **\*542** not results." [65] Even where a fiduciary's conduct does not meet that standard, "ERISA's obligations are nonetheless satisfied if the provider selected would have been chosen had the fiduciary conducted a proper investigation." [66]

In support of this showing, the Transferee Class simply alleges that a more prudent choice would have been to contract with more than one insurer, to avoid "put[ting] all of the Plan's eggs in one basket" and "placing everyone in jeopardy of losing retirement benefits based upon the fortunes of a single insurer." [67] The district court ruled that these allegations did not support a fiduciary breach because they were conclusory. [68] While that is a basis for dismissing this ground, the allegations also only implicate the results of the process, and not the conduct of FCI.

Additionally, however, the SAC includes allegations implicating the conduct of the Plan fiduciaries, asserting that the Prudential selection occurred on the same day as the amendment's adoption and that "VIMCO and

Plan fiduciaries did not prudently allow any period of time, much less a reasonable time period for consideration [of the annuity provider(s) ]." [69] Acknowledging that these allegations might plausibly assert that the Plan fiduciaries did not consider any annuity provider other than Prudential, the district court ruled that such an interpretation nevertheless was rendered implausible in light of other allegations in the SAC. To wit, the SAC alleges both that VIMCO employed FCI almost two months prior to the alleged date of decision, [70] and that FCI had submitted a written determination of the transaction's compliance with ERISA over a month prior to the date of the amendment. [71]

We agree, and find no error in the district court's dismissal of the Transferee Class's claim for fiduciary breach.

### D. Violation of ERISA § 510, 29 U.S.C. § 1140

The Transferee Class also alleged a violation of ERISA § 510 in the Plan amendment's transfer of benefit obligations for only certain Plan participants, asserting that such expulsion represented intentional interference with rights of the transferred participants. [72]

Section 510 provides that it is "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." [73] The district court dismissed this claim, ruling that the Transferee **\*543** Class failed to allege a viable right with which Verizon intended to interfere. [74]

Although acknowledging that § 510 requires discrimination "for the purpose of interfering with" a right, Appellants posit that § 510 prohibits expulsion without any intent-to-interfere requirement. Appellees argue that the prohibition on expulsion, like that on discrimination, must be made with the intent to interfere with a right under the plan. Neither party provides authority for their positions, and instead rely solely on their interpretation of the provision's language.

[25] Appellees' argument that expulsion must be attended by intent to interfere in order to be actionable, however, is supported by a practical consideration. Appellants' construction would divorce the intent-to-interfere requirement from any prohibition other than discrimination, which would also divorce those prohibitions from the object of the interference, i.e. "any right to which such participant may become entitled under the plan." Such a reading, which separates ERISA prohibitions from any rights in the ERISA-governed plan, is overly broad.

[26] Thus reading the expulsion prohibition to require an intent to interfere with a right under the Plan, Appellees proffer two bases for affirming the district court's dismissal of this claim. First, as the district court ruled, the Transferee Class did not identify a viable right with which Verizon interfered. In the SAC, the Transferee Class alleges interference with two rights, their continued participation in the Plan, and ERISA and PBGC protections. The Transferee Class asserts their right to continued participation arises from the language in the SPD, providing: "You are a plan participant as long as you have a vested benefit in the plan that has not been paid to you in full." [75] The district court rejected this argument, noting that the Annuitization Regulation provides that an individual ceases to be a participant when benefit rights are guaranteed by an insurance company. [76] On appeal, Appellants respond that, where the language of an SPD conflicts with that of a regulation, the SPD should control. This argument is unavailing even assuming the SPD controls because the SPD advised participants of the potential amendments which could affect their rights. [77] Although unaddressed by the district court, the Transferee Class assertion of rights in ERISA and PBGC protections is unsupported. As previously discussed regarding Appellants' similar assertion in Issue I, there is little support in ERISA provisions or regulations, or case law, for including ERISA protections and PBGC benefits as rights to which a plan participant is entitled. [78] Further, as Appellees point out, the right to any of ERISA and PBGC protections is dependent on the class members' right to continued participation.

By failing to allege a viable right with which the amendment interfered, the Transferee Class failed to state a claim and we find no error in the dismissal of this claim.

### E. Constitutional Standing

[27] On behalf of the Non-Transferee Class, Plaintiff Pundt asserts, through ERISA § 502(a)(2), 29 U.S.C.

§§ 1132(a)(2) and (a)(3), a claim for relief **544 under ERISA § 409(a), 28 U.S.C. § 1109, for violation of fiduciary obligations by the Plan fiduciaries. The district court ruled in *Lee III* that Pundt lacked constitutional standing to assert this claim, as asserted in the SAC, by reference to its prior basis for dismissal in *Lee II*. [79] Pundt challenges this ruling on appeal, and we must first address this challenge prior to any consideration of the merits since "[t]he requirement that jurisdiction be established as a threshold matter ... is inflexible and without exception." [80]

Section 502(a)(2) of ERISA allows a civil action to be brought by "a participant, beneficiary or fiduciary for appropriate relief under [ERISA § 409]." [81] In turn, § 409(a) creates a right to relief against fiduciaries for the restoration of any loss to a plan resulting from the breach of "any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter." [82] On appeal, the Non-Transferee Class asserts that Plan fiduciaries breached fiduciary duties by paying an excessive and unreasonable expense, echoing the ERISA § 404 basis alleged by the Transferee Class. [83]

**[28]** **[29]** **[30]** The dispute centers not on whether Pundt has statutory standing under § 502, but instead whether he has constitutional standing under Article III. [84] In order to establish the "irreducible, constitutional minimum" of Article-III standing, [85] "a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." [86] The showing involves an injury-in-fact requirement that the plaintiff has a "personal stake in the outcome of the controversy," [87] such that the injury is "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." [88] "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur.' " [89]

The district court ruled that Pundt had failed to allege an injury in fact sufficient to support constitutional standing. Appellants argue Pundt was injured through "losses to Plan assets held on [Pundt's] behalf as a direct result of the fiduciary mismanagement of Plan assets in violation **545 of ERISA," and that this

"invasion of his statutory right to proper management of Plan assets" is sufficiently concrete to provide standing. [90] Appellees argue instead that constitutional standing requires allegations to support injury against an individual's benefit payments, rather than injury to the plan as a whole. We agree with the district court's dismissal for lack of subject matter jurisdiction.

*Direct Harm to Participants.* Pundt first argues that fiduciary misconduct to his defined benefit plan presents individually cognizable harm, but this position is not supported by case law. The cases cited by Appellants discuss plans which, in contrast to the defined-benefit plan at issue here, present a more direct risk of harm from fiduciary misconduct. [91] For example, as the Supreme Court explained in *LaRue v. DeWolff, Boberg & Assocs.*, "[f]or defined contribution plans ... fiduciary misconduct need not threaten the solvency of the entire plan to reduce benefits below the amount that participants would otherwise receive." [92] As a result, other circuit courts have held that participants in defined-contribution plans had redressable, Article III standing because alleged fiduciary breaches had a direct effect on the amount of benefits. [93]

A defined-contribution plan presents a starkly different circumstance than a defined-benefit plan, which " 'as its name implies, is one where the employee, upon retirement, is entitled to a fixed periodic payment.' " [94] In contrast to plans in which fiduciary misconduct might present a more direct impact on a participant's interest, fiduciary misconduct in a defined-benefit plan "will not affect an individual's entitlement to a defined benefit unless it creates or enhances the risk of default by the entire plan" since such a plan "consists of a general pool of assets rather than individual dedicated accounts." [95] As a result, the injury to participants like Pundt is attenuated as, prior to default under the plan, "the employer typically bears the entire investment risk and—short of the consequences of plan termination—must cover any underfunding as the result of a shortfall that may occur from the plan's investments." [96] Moreover, even where an employer is unable to cover underfunding, the impact on participants is not certain since the PBGC provides statutorily-defined protection of participants' benefits. [97]

The degree to which the impact of fiduciary misconduct must be realized on this causal chain in order to establish

standing is a matter of first impression for this **\*546** court. However, considering similar circumstances, our sister circuits have concluded that constitutional standing for defined-benefit plan participants requires imminent risk of default by the plan, such that the participant's benefits are adversely affected; in turn, those courts have held that fiduciary misconduct, standing alone without allegations of impact on individual benefits, is too removed to establish the requisite injury.[98] The Fourth Circuit found such "risk-based theories of standing unpersuasive, not least because they rest on a highly speculative foundation lacking any discernible limiting principle."[99] It is true that those courts considered plans which remained overfunded after the alleged fiduciary misconduct, while here the complaint alleges that, immediately after the annuity transaction, the plan was "left in a far less stable financial condition and underfunded by almost \$2 billion or only about 66% actuarially funded."[100]

**[31]** However, regardless of whether the plan is allegedly under- or overfunded, the direct injury to a participants' benefits is dependent on the realization of several additional risks, which collectively render the injury too speculative to support standing. In the first instance and as previously discussed, absent plan termination, the employer must cover any shortfall resulting from plan instability.[101] Pundt's allegation that the plan was underfunded, and less financially stable, merely increases the relative likelihood that Verizon will have to cover a shortfall. However, Pundt's allegations do not further allege the realization of risks which would create a likelihood of direct injury to participants' benefits. To wit, Pundt does not allege a plan termination, an inability by Verizon address a shortfall in the event of a termination, or a direct effect thereof on participants' benefits; on the contrary, Appellants concede on appeal that the actuarial underfunding resulted in no direct injury to Pundt.

Pundt also asserts that he directly suffered constitutionally cognizable injury through invasion of his statutorily created right, specifically that the alleged fiduciary breach from the mismanagement of Plan assets constitutes an invasion of his statutory rights to proper Plan management, and invokes principles of disgorgement. In *David v. Alphin*, however, the Fourth Circuit rejected a similar argument as conflating the concepts of statutory and constitutional standing.[102] We agree with the Fourth

Circuit's reasoning in this regard. Article III standing is distinct from statutory standing, and we decline to undermine this distinction by recognizing the latter as conferring the former. Though the Supreme Court in *Lujan v. Defenders of Wildlife* allowed that the invasion of statutory rights might create standing, *Lujan* addressed constitutional standing arising from *de facto* injury, which is not alleged by a breach of fiduciary duty.[103] Importantly, the *Lujan* Court clarified that a legislative creation of rights does not eliminate the injury requirement for a **\*547** party seeking review.[104] Accordingly, at least with regard to a direct injury to Pundt as a class representative, we conclude that the allegations are insufficient to support his standing to assert this claim.

**[32]** *Harm to Plan as Injury-in-Fact.* While the alleged fiduciary misconduct is thus too attenuated to suffice as direct injury to Pundt, Appellants alternatively assert that the injury to the Plan itself is sufficient because Pundt is statutorily authorized to assert the claim on behalf of the Plan.

In support of his argument that a direct-benefit plan participant may bring suit on behalf of the plan, Appellants quote (without attribution) the Supreme Court's discussion in *Sprint Communications Co., L.P. v. APCC Services, Inc.*, of the various examples where courts permit suit for the benefit of parties that are not themselves bringing suit.[105] The *Sprint* Court held that an assignee for collection has Article III standing, even where the recovered proceeds of the claim are promised to the assignor, and even though the assignee did not originally suffer any injury.[106] Supporting the proposition that "the assignee of a claim has standing to assert the injury in fact suffered by the assignor," the *Sprint* Court cited to *Vermont Agency of Natural Resources v. United States ex rel. Stevens.*[107] In *Vermont Agency*, the Court held that a relator had Article III standing to bring a *qui tam* action because, through the government's partial assignment its claim for damages, the government had conferred its injury in fact to the relator.[108] In both *Sprint* and *Vermont Agency*, the Court found that the petitioners had standing based on the history and precedent permitting assignees to maintain suit.[109]

In light of this precedent, Appellants posit that Plan participants may bring suit in a quasi-representative capacity, satisfying Article III's injury-in-fact requirement via an injury to the Plan. However, we decline to adopt this position because both *Sprint* and *Vermont Agency* are distinguishable in critical respects. First, those cases involved assignment between the parties, while here the Plan and Plan participants have no such relationship, and the Appellants do not argue that ERISA effects such an assignment (as did the statute in *Vermont Agency*). Since the Court's reasoning in both cases was firmly grounded on the history and tradition of assignment relationships, applying that reasoning to a circumstance in which no such relationship existed is speculative.

Second and even more significant, *Sprint* and *Vermont Agency* both involved the assignor as the injured party. Here, on the other hand, Appellants seek standing based on statutory authorization by an uninjured government, to seek redress by one private party of the injury to another private party. As the Eighth Circuit noted regarding similar circumstances, extending **\*548** *Sprint* in such a way raises "serious constitutional concerns," because "[i]f Congress could assign an ERISA plan's claim to a participant who is not injured, ... then what principled reason would preclude Congress from assigning the claim to any stranger?" [110] Collectively, the facts and reasoning of *Sprint* and *Vermont Agency* allow a practical answer to this question, permitting Congress to satisfy the injury-in-fact by statutory assignment, yet only when the government is the injured party. Bearing in mind that "[i]n no event ... may Congress abrogate Article III minima," we decline to otherwise construe and expand the reasoning of *Sprint*. [111]

For those reasons, we find no error the district court's dismissing the claim of the Non-Transferee Class for lack of subject matter jurisdiction.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

### All Citations

837 F.3d 523, Pens. Plan Guide (CCH) P 24019Y

---

Footnotes

1     The relevant provisions of the Amendment are as follows:

         (i) The annuity contract shall fully guarantee and pay each pension benefit earned by a "Designated Participant."

         (ii) The annuity contract shall provide for the continued payment of the Designated Participant's pension benefit ... in the same form that was in effect under the Plan immediately before the annuity purchase....

         ....

         (iv) After the annuity purchase ..., the Plan shall have no further obligation to make any payment with respect to any pension benefit of a Designated Participant.... ROA.119–20.

         The term "Designated Participant" generally describes members of the Transferee Class, as it includes Plan participants who were receiving benefits at the time of the annuity transaction, and who had retired before January 1, 2010.

2     At the request of the Transferee Class representatives, the application for temporary restraining order was converted into a motion for a preliminary injunction.

3     *Lee v. Verizon Commc'ns Inc.*, 2012 WL 6089041, at \*1 (N.D. Tex. Dec. 7, 2012) ("*Lee I*").

4     *Lee v. Verizon Commc'ns Inc.*, 954 F.Supp.2d 486, 499 (N.D. Tex. June 24, 2013) ("*Lee II*").

5     *Id.*

6     ROA.1372-1422 ("SAC").

7     *Lee v. Verizon Commc'ns Inc.*, 2014 WL 1407416, at \*9 (N.D. Tex. Apr. 11, 2014) ("*Lee III*").

8     See *id.* at \*2.

9     See *id.* at \*2–9.

10     See *Rosenblatt v. United Way of Greater Houston*, 607 F.3d 413, 417 (5th Cir. 2010) (citing *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007)).

11     *Id.* (citing *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996)).

12     *Id.* (internal quotation marks omitted).

13   See *Ballew v. Continental Airlines, Inc.*, 668 F.3d 777, 781 (5th Cir. 2012) (citing *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)).

14   See *Cobb v. Cent. States*, 461 F.3d 632, 635 (5th Cir. 2006); *see also Hermann Hosp. v. MEBA Med. & Benefits Plan*, 845 F.2d 1286, 1288–89 (5th Cir.1988) (considering ERISA standing as a question of subject matter jurisdiction).

15   See Fed. R. Civ. P. 12(b)(1).

16   *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).

17   29 U.S.C. § 1022(b) (2012).

18   29 C.F.R. § 2520.102-3(*l*) (2015).

19   986 F.2d 929 (5th Cir. 1993).

20   *Id.* at 935.

21   See *Koehler v. Aetna Health Inc.*, 683 F.3d 182, 189 (5th Cir. 2012); *Layaou v. Xerox Corp.* 238 F.3d 205, 211 (2d Cir. 2001).

22   29 U.S.C. § 1024(b)(1)(B).

23   338 F.3d 407 (5th Cir. 2003).

24   *Id.* at 428.

25   *Id.*

26   29 C.F.R. § 2510.3–3(d)(2)(ii) (2015).

27   29 U.S.C. § 1104(a)(1)(A) (2012).

28   *Id.* § 1104(a)(1).

29   *Id.* § 1104(a)(1)(B).

30   ROA.83.

31   *Beck v. PACE Intern. Union*, 551 U.S. 96, 101, 127 S.Ct. 2310, 168 L.Ed.2d 1 (2007).

32   See *Pegram v. Herdrich*, 530 U.S. 211, 225–26, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000).

33   *Beck*, 551 U.S. at 101, 127 S.Ct. 2310.

34   *Pegram*, 530 U.S. at 226, 120 S.Ct. 2143.

35   *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 251 (5th Cir. 2008) (internal quotation marks omitted); *see also* 29 U.S.C. § 1002(21)(A) (2012) (providing that "[a] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets [ ] ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.").

36   *Id.* at 251.

37   *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999).

38   *Id.* at 444-45, 119 S.Ct. 755.

39   551 U.S. 96, 101–02, 127 S.Ct. 2310, 168 L.Ed.2d 1 (2007).

40   See *id.*

41   See *id.*

42   See *id.* at 102, 127 S.Ct. 2310.

43   *Id.* at 110, 127 S.Ct. 2310.

44   *Id.* at 106, 127 S.Ct. 2310 (emphasis in original).

45   *Id.*

46   *Id.* at 102, 127 S.Ct. 2310.

47   See 29 C.F.R. § 2510.3–3(d)(2)(ii) (2015). *See also* 29 U.S.C. §§ 1341 (termination); 1058 (merger).

48   29 C.F.R. § 2510.3–3(d)(2)(ii) (2012).

49   See Interpretive Bulletins Relating to the Employee Retirement Income Security Act of 1974, 60 Fed. Reg. 12328, 12328 (Mar. 6, 1995) (providing,

    [p]ension plans purchase benefit distribution annuity contracts in a variety of circumstances. Such annuities may be purchased for participants and beneficiaries in connection with the termination of a plan, or in the case of an ongoing plan, annuities might be purchased for participants who are retiring or separating from service with accrued vested benefits.).

50   The Transferee Class also alleged that the annuity transaction breached a fiduciary duty by underfunding the Plan in violation of several statutes. The district court dismissed this claim and, although the Transferee Class makes passing

51    reference to underfunding in its brief, it does not substantively urge review of the district court's dismissal of this ground on appeal. The issue is therefore waived. *See Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) (citation omitted).

51    The SAC does not describe in any detail how selecting an internal annuity was an amendment-compliant option within the discretion of Plan fiduciaries. At a minimum, however, maintaining the PBGC protections sought by the Transferee Class requires the payment of premiums, *see* 29 U.S.C. § 1307, which would run afoul of the amendment's requirement that, after the annuity transaction, "the Plan shall have no further obligation to make *any payment with respect to any pension benefit* of a Designated Participant." ROA.120 (emphasis added).

52    *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 443, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) (citing *Lockheed Corp. v. Spink*, 517 U.S. 882, 890–91, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996)).

53    36 F.3d 746, 756 (8th Cir. 1994), *aff'd on other grounds*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996).

54    29 U.S.C. § 1104(a).

55    29 C.F.R. § 2510.3–3(d)(2)(ii).

56    110 F.3d 1461, 1463 (9th Cir. 1997).

57    29 C.F.R. § 2510.3–3(d)(2)(ii).

58    *See Beck v. PACE Intern. Union*, 551 U.S. 96, 106, 127 S.Ct. 2310, 168 L.Ed.2d 1 (2007).

59    SAC at ¶ 114 (emphasis in original).

60    *Id.* at ¶ 115.

61    *Lee III*, 2014 WL 1407416, at *4 (citing *Lee II*, 954 F.Supp.2d at 494).

62    Dept. of Labor Advisory Opinion 2001-01A (January 18, 2001) (emphasis added). Available at: http://www.dol.gov/ebsa/regs/aos/ao2001-01a.html.

63    *See* Blue Br. 38–39.

64    223 F.3d 286, 300 (5th Cir. 2000) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)) (second alteration in original).

65    *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 253 (5th Cir. 2008).

66    *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 300 (5th Cir. 2000) (citation omitted).

67    SAC at ¶ 109.

68    *See Lee III* at 2014 WL 1407416, at *7.

69    SAC at ¶ 110.

70    *Id.* at ¶ 29(A).

71    *Id.* at ¶ 29(C).

72    As an initial point, Appellants argue that this case brings the question of whether a plan amendment can be actionable under § 510 directly before the court, and cites several previous opinions which did not address the issue. *See McGann v. H & H Music Co.*, 946 F.2d 401, 406 n.8 (5th Cir. 1991), *cert. denied sub nom, Greenberg v. H & H Music Co.*, 506 U.S. 981, 113 S.Ct. 482, 121 L.Ed.2d 387 (1992); *Hines v. Mass. Mut. Life Ins. Co.*, 43 F.3d 207, 210 n.5 (5th Cir. 1995), *overruled on other grounds*, *Arana v. Ochsner Health Plan*, 338 F.3d 433 (5th Cir. 2003). However, because we hold that Appellants failed to allege a right with which Verizon intended to interfere, the issue is not before us.

73    29 U.S.C. § 1140.

74    *Lee III*, 2014 WL 1407416, at *2 (citing *Lee II*, 954 F.Supp.2d at 495).

75    ROA.77.

76    *See* 29 C.F.R. § 2510.3–3(d)(2)(ii) (2015).

77    ROA.75.

78    *See* III.B., *supra*.

79    *See Lee III*, 2014 WL 1407416, at *2 (citing *Lee II*, 954 F.Supp.2d at 496).

80    *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

81    29 U.S.C. § 1132(a)(2) (2012).

82    29 U.S.C. § 1109 (2012).

83    As with the allegations by the Transferee Class regarding breach of fiduciary duties under ERISA § 404(a), the Non-Transferee Class alleged below that the annuity transaction underfunded the Plan in violation of ERISA and the Internal Revenue Code. The Non-Transferee Class, however, does not urge review of those allegations on appeal.

84    U.S. CONST. art. III, § 2.

85    *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

86   *Susan B. Anthony List v. Driehaus*, —— U.S. ——, 134 S.Ct. 2334, 2341, 189 L.Ed.2d 246 (2014) (quoting *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130) (internal quotation marks and alterations omitted).

87   *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

88   *Id.* (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130) (internal quotation marks omitted).

89   *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. ——, —— n. 5, 133 S.Ct. 1138, 1147, 1150 n.5, 185 L.Ed.2d 264 (2013)) (internal quotation marks omitted).

90   Blue Br. 52.

91   *See Tolbert v. RBC Capital Markets Corp.*, 758 F.3d 619 (5th Cir. 2014) (considering ERISA's application to a wealth accumulation plan, another type of "employee pension benefit plan" whereby benefits are dependent upon individual employee contributions and investment performance); *Leigh v. Engle*, 727 F.2d 113 (7th Cir. 1984) (considering a profit-sharing trust).

92   *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 255–56, 128 S.Ct. 1020, 169 L.Ed.2d 847 (2008).

93   *See, e.g., Harris v. Amgen, Inc.*, 573 F.3d 728, 735–36 (9th Cir. 2009).

94   *Beck v. PACE Intern. Union*, 551 U.S. 96, 98, 127 S.Ct. 2310, 168 L.Ed.2d 1 (2007) (quoting *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 154, 113 S.Ct. 2006, 124 L.Ed.2d 71 (1993)).

95   *LaRue*, 552 U.S. at 255, 128 S.Ct. 1020 (contrasting the impact of fiduciary misconduct in defined-contribution and defined-benefit plans).

96   *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999).

97   *See* 29 U.S.C. § 1322.

98   *See, e.g., David v. Alphin*, 704 F.3d 327, 338 (4th Cir. 2013); *Harley v. Minn. Mining & Mfg. Co.*, 284 F.3d 901, 906 (8th Cir. 2002), *Perelman v. Perelman*, 919 F.Supp.2d 512, 517–520 (E.D. Pa. Jan. 24, 2013), *aff'd*, 793 F.3d 368 (3rd Cir.2015).

99   *David*, 704 F.3d at 338.

100   ROA.1386.

101   *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999).

102   *See David*, 704 F.3d at 338.

103   504 U.S. 555, 577–78, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

104   *See id.* at 578, 112 S.Ct. 2130.

105   554 U.S. 269, 287–88, 128 S.Ct. 2531, 171 L.Ed.2d 424 (2008) (noting that "federal courts routinely entertain suits which will result in relief for parties that are not themselves directly bringing suit. Trustees bring suits to benefit their trusts; guardians ad litem bring suits to benefit their wards; receivers bring suit to benefit their receiverships; assignees in bankruptcy bring suit to benefit bankrupt estates; executors bring suit to benefit testator estates; and so forth.").

106   554 U.S. at 285–87, 128 S.Ct. 2531.

107   529 U.S. 765, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000).

108   *See id.* at 773, 120 S.Ct. 1858.

109   *See Sprint*, 554 U.S. at 285–86, 128 S.Ct. 2531.

110   *McCullough v. AEGON USA Inc.*, 585 F.3d 1082, 1086 (8th Cir. 2009).

111   *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979).

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 6803046
Only the Westlaw citation is currently available.
United States Court of Appeals,
Ninth Circuit.

State of Missouri ex rel. Chris Koster, Attorney
General; State of Nebraska ex rel. Jon Bruning,
Attorney General; State of Oklahoma ex rel.
E. Scott Pruitt, Attorney General; State of
Alabama ex rel. Luther Strange, Attorney
General; Commonwealth of Kentucky ex rel. Jack
Conway, Attorney General; Terry E. Branstad,
Governor of State of Iowa, Plaintiffs–Appellants,
v.
Kamala D. Harris, in her official capacity as
Attorney General of the State of California;
Karen Ross, in her official capacity as
Secretary of the California Department of
Food and Agriculture, Defendants–Appellees,
and
Humane Society of the United States;
Association of California Egg Farmers,
Intervenor–Defendants–Appellees.

No. 14-17111
|
Argued and Submitted October
19, 2016 San Francisco, California
|
Filed November 17, 2016

**Synopsis**
**Background:** Six states brought action against California
Attorney General, alleging that California statute, which
required all eggs sold in California to come from farm
that complied with certain animal care standards, violated
Commerce Clause. After advocate group and association
representing California's egg farmers intervened as
defendants, 2014 WL 2506606, the United States District
Court for the Eastern District of California, Kimberly
J. Mueller, J., 58 F.Supp.3d 1059, dismissed for lack of
standing, and states appealed.

**Holdings:** The Court of Appeals, Graber, Circuit Judge,
held that:

[1] alleged harm to states' egg farmers was insufficient to
establish parens patriae standing;

[2] states' allegations that statute would result in
fluctuations of egg prices were insufficient to support
Article III standing;

[3] states could not establish parens patriae standing based
on alleged discrimination; and

[4] district court abused its discretion by dismissing action
with, rather than without, prejudice.

Affirmed and remanded.

West Headnotes (20)

**[1]    States**
👉 Capacity of state to sue in general

States asserting parens patriae standing must
meet both the basic requirements of Article
III standing and the unique requirements of
parens patriae doctrine. U.S. Const. art. 3, §
2, cl. 1.

Cases that cite this headnote

**[2]    Federal Civil Procedure**
👉 In general;injury or interest
**Federal Civil Procedure**
👉 Causation;redressability

To establish Article III standing, an injury
must be concrete, particularized, and actual
or imminent; fairly traceable to the challenged
action; and redressable by a favorable ruling.
U.S. Const. art. 3, § 2, cl. 1.

Cases that cite this headnote

**[3]    States**
👉 Capacity of state to sue in general

In a parens patriae case, there are two
requirements in addition to requirements for
Article III standing: first, the state must
articulate an interest apart from the interests

of particular private parties, i.e., the state must be more than a nominal party; second, the state must express a quasi-sovereign interest.
U.S. Const. art. 3, § 2, cl. 1.

Cases that cite this headnote

**[4]** **States**
 🗝 Capacity of state to sue in general

In order for a state to establish parens patriae standing, more must be alleged than injury to an identifiable group of individual residents.

Cases that cite this headnote

**[5]** **States**
 🗝 Capacity of state to sue in general

In deciding whether a state has established parens patriae standing, the indirect effects of the injury must be considered in determining whether the state has alleged injury to a sufficiently substantial segment of its population.

Cases that cite this headnote

**[6]** **States**
 🗝 Capacity of state to sue in general

Alleged harm to egg farmers in states challenging California statute requiring all eggs sold in California to come from farm that complied with certain animal care standards was insufficient to satisfy first prong of test for parens patriae standing, which requires a state to articulate an interest apart from the interests of particular private parties, since complete relief would be available to egg farmers themselves if they filed a complaint on their own behalf. Cal. Health & Safety Code § 25996; Cal. Code Regs. tit. 3, § 1350(d)(1).

Cases that cite this headnote

**[7]** **Commerce**
 🗝 Food products
 **States**
 🗝 Capacity of state to sue in general

States' allegations that California statute requiring all eggs sold in California to come from farm that complied with certain animal care standards would result in fluctuations in the price of eggs, thereby harming consumers, were too speculative to support Article III standing, in states' action challenging the statute under the Commerce Clause; alleged price effects for consumers were remote and contingent upon the decisions of many independent actors in the causal chain in response to California laws that had no direct effect on either price or supply. U.S. Const. art. 1, § 8, cl. 3, art. 3, § 2, cl. 1; Cal. Health & Safety Code § 25996; Cal. Code Regs. tit. 3, § 1350(d)(1).

Cases that cite this headnote

**[8]** **Commerce**
 🗝 Food products
 **States**
 🗝 Capacity of state to sue in general

Alleged increase in egg prices that would occur as a result of egg producers' compliance with California statute requiring all eggs sold in California to come from farm that complied with certain animal care standards was insufficient to give states parens patriae standing to challenge statute under the Commerce Clause; price increase was speculative, since California would not increase egg prices for states' consumers, and eggs were an ordinary consumer commodity that lacked central economic significance. U.S. Const. art. 1, § 8, cl. 3; Cal. Health & Safety Code § 25996; Cal. Code Regs. tit. 3, § 1350(d)(1).

Cases that cite this headnote

**[9]** **Commerce**
 🗝 Food products
 **States**
 🗝 Capacity of state to sue in general

Alleged decrease in egg prices that would occur if egg farmers did not bring their farms into compliance with California statute

requiring all eggs sold in California to come from farm that complied with certain animal care standards was insufficient to give states parens patriae standing to challenge statute under Commerce Clause; decrease in egg prices would harm only egg farmers, not their consumers, and an injury to egg farmers alone was not sufficient to sustain parens patriae standing. U.S. Const. art. 1, § 8, cl. 3; Cal. Health & Safety Code § 25996; Cal. Code Regs. tit. 3, § 1350(d)(1).

Cases that cite this headnote

**[10]** **Commerce**
👉 Food products

**States**
👉 Capacity of state to sue in general

California statute requiring all eggs sold in California to come from farm that complied with certain animal care standards was not discriminatory, and thus states challenging statute under the Commerce Clause could not establish parens patriae standing based on alleged discrimination of their citizens; statute did not distinguish among eggs based on their state of origin, but rather applied equally to California egg farmers, and did not erect trade barriers against states' broader economies. U.S. Const. art. 1, § 8, cl. 3; Cal. Health & Safety Code § 25996; Cal. Code Regs. tit. 3, § 1350(d)(1).

Cases that cite this headnote

**[11]** **Commerce**
👉 Preferences and Discriminations

A statute that treats both intrastate and interstate products alike is not discriminatory, as would violate the Commerce Clause. U.S. Const. art. 1, § 8, cl. 3.

Cases that cite this headnote

**[12]** **Federal Courts**
👉 Pleading

Denial of leave to amend a pleading is reviewed for an abuse of discretion. Fed. R. Civ. P. 15.

Cases that cite this headnote

**[13]** **Federal Civil Procedure**
👉 Pleading over

**Federal Courts**
👉 Pleading

Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment. Fed. R. Civ. P. 15.

Cases that cite this headnote

**[14]** **Federal Civil Procedure**
👉 Form and sufficiency of amendment; futility

A district court does not err in denying leave to amend a complaint where the amendment would be futile; an amendment is futile when no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense. Fed. R. Civ. P. 15.

Cases that cite this headnote

**[15]** **Federal Civil Procedure**
👉 In general;injury or interest

Standing is determined as of the commencement of litigation.

Cases that cite this headnote

**[16]** **States**
👉 Capacity of state to sue in general

Allegations by states challenging California statute requiring all eggs sold in California to come from farm that complied with certain animal care standards that eggs were an important, affordable source of protein with which the statute threatened to interfere and that the threat of increased egg prices affected grocers, bakers, and restaurant owners in

Case: 11-56843, 12/01/2016, ID: 10217577, DktEntry: 105, Page 45 of 51

Missouri ex rel. Koster v. Harris, F.3d ---- (2016)

addition to egg farmers were insufficient to establish parens patriae standing; at most, states alleged a potential price increase for consumers indirectly resulting from the statute, and such allegations were speculative. U.S. Const. art. 3, § 2, cl. 1; Cal. Health & Safety Code § 25996; Cal. Code Regs. tit. 3, § 1350(d)(1).

Cases that cite this headnote

---

[17] **Federal Courts**
🔑 Dismissal or other disposition

In states' action challenging California statute requiring all eggs sold in California to come from farm that complied with certain animal care standards, district court abused its discretion by dismissing action with, rather than without, prejudice based on lack of standing, since states could, in theory, allege facts from after the statutes' effective date that might support parens patriae standing. U.S. Const. art. 3, § 2, cl. 1; Cal. Health & Safety Code § 25996; Cal. Code Regs. tit. 3, § 1350(d)(1).

Cases that cite this headnote

---

[18] **Federal Courts**
🔑 Pleading

Court of Appeals reviews for abuse of discretion a district court's decision to dismiss with prejudice.

Cases that cite this headnote

---

[19] **Federal Courts**
🔑 Dismissal or other disposition

In general, dismissal for lack of subject matter jurisdiction is without prejudice.

Cases that cite this headnote

---

[20] **Federal Courts**
🔑 Dismissal or other disposition

**Federal Courts**

🔑 Objections, proceedings, and determination

Exceptions to the general rule that dismissal for lack of subject matter jurisdiction is without prejudice include dismissals on the ground of sovereign immunity and situations in which the plaintiff could not have possibly amended his complaint to allege an injury in fact, as required for Article III standing. U.S. Const. art. 3, § 2, cl. 1.

Cases that cite this headnote

---

Appeal from the United States District Court for the Eastern District of California, Kimberly J. Mueller, District Judge, Presiding, D.C. No. 2:14–cv–00341–KJM–KJN,

**Attorneys and Law Firms**

J. Andrew Hirth (argued), Deputy General Counsel, Office of the Missouri Attorney General, Jefferson City, Missouri, for Plaintiffs–Appellants.

Paul Stein (argued) and Stephanie F. Zook, Deputy Attorneys General; Constance L. LeLouis, Supervising Deputy Attorney General; Douglas J. Woods, Senior Assistant Attorney General; Kamala D. Harris, Attorney General; Office of the Attorney General, San Francisco, California, for Defendants–Appellees.

Bruce Wagman (argued), Schiff Hardin LLP, San Francisco, California; Rebecca Cary and Peter A. Brandt, Humane Society of the United States, Washington, D.C.; Jonathan Y. Ellis and J. Scott Ballenger, Latham & Watkins LLP, Washington, D.C., for Intervenor–Defendant–Appellee Humane Society of the United States.

Carl Nichols (argued), Thomas G. Sprankling, Adam I. Klein, and Francesco Valenti, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; Randall R. Lee, Wilmer Cutler Pickering Hale and Dorr LLP, Los Angeles, California, for Intervenor–Defendant–Appellee Association of California Egg Farmers.

Sean D. Reyes, Utah Attorney General; Parker Douglas, Utah Federal Solicitor; Utah Attorney General's Office, Salt Lake City, Utah, for Amicus Curiae State of Utah.

Missouri ex rel. Koster v. Harris, --- F.3d ---- (2016)

Case: 11-56843, 12/01/2016, ID: 10217577, DktEntry: 105, Page 46 of 51

Timothy S. Bishop, Michael B. Kimberly, and James F. Tierney, Mayer Brown LLP, Washington, D.C.; Ellen B. Steen and Danielle Hallcom Quist, America Farm Bureau Federation, Washington, D.C., for Amicus Curiae American Farm Bureau Federation.

Diane L. McGimsey, Edward E. Johnson, Janet Y. Galeria, and Jonathon D. Townsend, Sullivan & Cromwell LLP, Los Angeles, California, for Amici Curiae Animal Legal Defense Fund; Compassion Over Killing, Inc.; and Farm Sanctuary, Inc.

Before: Susan P. Graber and Mary H. Murguia, Circuit Judges, and Raner C. Collins, ** Chief District Judge.

**OPINION**

GRABER, Circuit Judge:

California enacted laws and regulations prescribing standards for the conditions under which chickens must be kept in order for their eggs to be sold in the state. Plaintiffs are six states, which sued to block enforcement of those laws and regulations before they took effect. We agree with the district court that Plaintiffs lacked standing to bring this case as *parens patriae*. We also hold that the district court did not err in denying Plaintiffs leave to amend their complaint. But because the action should have been dismissed without prejudice, we affirm but remand with instructions to dismiss the action without prejudice.

In the 2008 general election, California voters adopted Proposition 2, which enacted new standards beginning on January 1, 2015, for housing farm animals within California including, as relevant here, egg-laying hens. Cal. Health & Safety Code §§ 25990–94. Under Proposition 2, hens may not be confined for the majority of any day "in a manner that prevents [them] from: (a) Lying down, standing up, and fully extending [their] limbs; and (b) Turning around freely." *Id.* § 25990. A violation of these standards is punishable by a $1,000 fine or imprisonment of 180 days in county jail, or both. *Id.* § 25993.

In 2010, California's legislature adopted Assembly Bill 1437 ("AB1437"), which mandated, also beginning on

January 1, 2015, that "a shelled egg shall not be sold or contracted for sale for human consumption in California if the seller knows or should have known that the egg is the product of an egg-laying hen that was confined on a farm or place that is not in compliance with animal care standards set forth in [Proposition 2]." Cal. Health & Safety Code § 25996. Therefore, all eggs sold in California must comply with Proposition 2. In 2013, the California Department of Food and Agriculture promulgated egg-related regulations, including salmonella prevention measures and minimum cage sizes for egg-laying hens, all of which also carried an effective date of January 1, 2015. Cal. Code Regs. tit. 3, § 1350(d)(1).

**\*2** On February 3, 2014, the State of Missouri filed a complaint in the Eastern District of California, asking the court to declare AB1437 and California Code § 1350(d)(1) (collectively the "Shell Egg Laws") invalid, as violating the Commerce Clause or as preempted by federal statute, and to enjoin California from enforcing the laws. Plaintiffs then filed their First Amended Complaint (the "complaint"), joining the States of Nebraska, Oklahoma, Alabama, and Kentucky and the Governor of Iowa as additional plaintiffs. The Humane Society of the United States and the Association of California Egg Farmers ("Intervenors") moved to intervene as defendants, which the court allowed. Defendants filed a motion to dismiss for lack of subject matter jurisdiction; Intervenors filed their own, similar motions. The district court granted the motions to dismiss, with prejudice. The court concluded that Plaintiffs lacked standing as *parens patriae*, held that their claim was not justiciable, and denied leave to amend as futile. Plaintiffs timely appeal.

*A. Parens Patriae Standing*

**[1]** **[2]** **[3]** States asserting *parens patriae* standing must meet both the basic requirements of Article III standing and the unique requirements of that doctrine. *Table Bluff Reservation (Wiyot Tribe) v. Philip Morris, Inc.*, 256 F.3d 879, 885 (9th Cir. 2001). "To establish Article III standing, an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, ––– U.S. ––––, 133 S.Ct. 1138, 1147, 185 L.Ed.2d 264 (2013) (internal quotation marks omitted). In a *parens patriae* case, there are two additional requirements. First, "the State must articulate an interest apart from the interests of particular private parties, *i.e.*, the State must be more than a nominal party." *Alfred L. Snapp & Son, Inc.*

Missouri ex rel. Koster v. Harris, F.3d ---- (2016)

Case: 11-56843, 12/01/2016, ID: 10217577, DktEntry: 105, Page 47 of 51

*v. Puerto Rico ex rel. Barez ("Snapp")*, 458 U.S. 592, 607, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). Second, "[t]he State must express a quasi-sovereign interest." *Id.* On de novo review, *Habeas Corpus Res. Ctr. v. U.S. Dep't of Justice*, 816 F.3d 1241, 1247 (9th Cir. 2016), we conclude that Plaintiffs have not met the first requirement. We therefore need not, and do not, reach the second part of the test, nor do we reach the issue of ripeness.

**[4]** **[5]** There are no "definitive limits on the proportion of the population of the State that must be adversely affected." *Snapp*, 458 U.S. at 607, 102 S.Ct. 3260. But "more must be alleged than injury to an identifiable group of individual residents." *Id.* "[T]he indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population." *Id.*[1]

Concerning the parties, the complaint alleges: "Missouri farmers produced nearly two billion eggs in 2012 and generated approximately $171 million in revenue for the state"; "Nebraska is one of the top ten largest egg producers in the United States"; "Alabama is one of the top fifteen largest egg producers in the United States"; "Kentucky farmers produced approximately 1.037 billion eggs in 2012 and generated approximately $116 million in revenue for the state"; "Oklahoma farmers produced more than 700 million eggs in 2012 and generated approximately $90 million in revenue for the state"; and "Iowa is the number one state in egg production[,] Iowa farmers produce over 14.4 billion eggs per year," and "[t]he cost to Iowa farmers to retrofit existing housing or build new housing that complies with AB1437 would be substantial."

**\*3** The laws "forc[e] Plaintiffs' farmers either to forgo California's markets altogether or accept significantly increased production costs just to comply." That is, "Plaintiffs' egg farmers must choose either to bring their entire operations into compliance ... or else simply leave the California marketplace." "[T]he necessary capital improvements [would] cost Plaintiffs' farmers hundreds of millions of dollars," and, without access to the California market, "supply would outpace demand by half a billion eggs, causing the price of eggs—as well as egg farmers' margins—to fall throughout the Midwest and potentially forc[e] some Missouri producers out of business. The same goes for egg producers in Nebraska, Alabama, Oklahoma, Kentucky, and Iowa."

In short, the complaint alleges the importance of the California market *to egg farmers* in the Plaintiff States and the difficult choice that *egg farmers* face in deciding whether to comply with the Shell Egg Laws. The complaint contains no specific allegations about the statewide magnitude of these difficulties[2] or the extent to which they affect more than just an "identifiable group of individual" egg farmers. *Snapp*, 458 U.S. at 607, 102 S.Ct. 3260.

Plaintiffs advance several theories to demonstrate "an interest apart from the interests of particular private parties" and an effect on "a sufficiently substantial segment of [the] population." *Id.* First, Plaintiffs allege harm to their egg farmers. Second, Plaintiffs argue that the Shell Egg Laws will cause harmful fluctuations in the price of eggs. Finally, Plaintiffs allege that they will suffer discrimination from the Shell Egg Laws. For the reasons that follow, none of these theories establishes standing.

### 1. *Alleged Harm to Egg Farmers*

**[6]** Alleging harm to the egg farmers in Plaintiffs' States is insufficient to satisfy the first prong of *parens patriae* standing. Other courts have recognized that *parens patriae* standing is inappropriate where an aggrieved party could seek private relief. The Second Circuit, for example, held that "*[p]arens patriae* standing ... requires a finding that individuals could not obtain complete relief through a private suit." *N. Y. ex rel. Abrams v. 11 Cornwell Co.*, 695 F.2d 34, 40 (2d Cir. 1982), *vacated in part on other grounds*, 718 F.2d 22 (2d Cir. 1983) (en banc); *see also Connecticut v. Physicians Health Servs. of Conn., Inc.*, 103 F.Supp.2d 495, 504 (D. Conn. 2000) (noting that "the Second Circuit has interpreted *Snapp* to require a finding that the State act on behalf of individuals who could not obtain complete relief through a private suit"). Here, complete relief would be available to the egg farmers themselves, were they to file a complaint on their own behalf.

Supreme Court cases in which private relief was held to be unlikely or unrealistic illustrate why *parens patriae* standing does not lie here. In *Missouri v. Illinois*, 180 U.S. 208, 21 S.Ct. 331, 45 L.Ed. 497 (1901), though never explicitly calling it a *parens patriae* case, the Supreme Court heard a sewage dispute between two states. The Court observed that "the nature of the injury complained of is such that an adequate remedy can only be found

in this court at the suit of the state of Missouri." *Id.* at 241, 21 S.Ct. 331. The Court emphasized that the "health and comfort of the large communities inhabiting those parts of the state situated on the Mississippi River are not alone concerned, but contagious and typhoidal diseases introduced in the river communities may spread themselves throughout the territory of the state." *Id.*; *see also Snapp,* 458 U.S. at 603, 102 S.Ct. 3260 (describing "a line of cases ... in which States successfully sought to represent the interests of their citizens in enjoining public nuisances"). In other words, Missouri alleged that a public health hazard affected its entire population. By contrast, the Shell Egg Laws are not alleged to threaten the health of the entire population (or, indeed of anyone), and those directly affected—egg farmers—are capable of pursuing their own interests.

**\*4** A rationale similar to that in *Missouri v. Illinois* supported *parens patriae* standing in *Maryland v. Louisiana,* 451 U.S. 725, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981). There, Louisiana imposed a "First–Use Tax" on natural gas piped into the state from federal offshore drilling areas. A group of states, later joined by the federal government and several pipeline companies, filed an original jurisdiction suit in the Supreme Court challenging the tax under, among other sources, the Commerce Clause. The Court found jurisdiction on several theories, including the States' interest as *parens patriae. Id.* at 737, 101 S.Ct. 2114. The Court observed that

> the incidence of the Tax [does not] fall on a small group of citizens who are likely to challenge the Tax directly. Rather, a great many citizens in each of the plaintiff States are themselves consumers of natural gas and are faced with increased costs aggregating millions of dollars per year. As the Special Master observed, individual consumers cannot be expected to litigate the validity of the First–Use Tax given that the amounts paid by each consumer are likely to be relatively small.

*Id.* at 739, 101 S.Ct. 2114. *Maryland v. Louisiana*'s logic counsels the opposite result here: Whereas millions of consumers probably cannot challenge another state's tax

on their commodities, large egg producers certainly could file an action like this one on their own.

### 2. *Alleged Fluctuation in the Price of Eggs*

**[7]** Plaintiffs argue that fluctuations in the price of eggs will harm consumers, thereby affecting a substantial segment of their populations and establishing *parens patriae* standing. Plaintiffs filed their complaint before the Shell Egg Laws took effect. As a result, their allegations about the potential economic effects of those laws, after implementation, were necessarily speculative. Indeed, Plaintiffs' allegations are inconsistent; the complaint alleges that prices will go either up or down. On the one hand, Plaintiffs allege that farmers must bring all egg facilities into compliance with the Shell Egg Laws, regardless of the proportion of their product actually bound for California, because the demand across markets fluctuates. The cost of "compliant" eggs will thus increase across the board. On the other hand, Plaintiffs allege that, if farmers decline to comply and they exit the California market, "the price of eggs ... [would] fall throughout the Midwest." Neither of these alleged results is sufficient to support *parens patriae* standing.

At the outset, the unavoidable uncertainty of the alleged future changes in price makes the alleged injury insufficient for Article III standing. In *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 562, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the Supreme Court explained that it is "substantially more difficult" for a plaintiff to establish standing when the plaintiff "is not himself the object of the government action or inaction he challenges":

> **\*5** [C]ausation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well. The existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, and it becomes the burden of the plaintiff to adduce facts showing that those choices

Missouri ex rel. Koster v. Harris, F.3d ---- (2016)

Case: 11-56843, 12/01/2016, ID: 10217577, DktEntry: 105, Page 49 of 51

have been or will be made in such manner as to produce causation and permit redressability of injury.

*Id.* (citations and internal quotation marks omitted). Although *Lujan* describes facts that must be averred on summary judgment, the complaint here cannot allege, even under the more permissive standards at the pleading stage, that the choices leading to consumer price increases "have been or will be made." *Id.* Instead, the allegations in the complaint are "too speculative for Article III purposes," and Plaintiffs have failed to explain how the injury is "*certainly* impending." *Id.* at 565 n.2, 112 S.Ct. 2130 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)); *see also Clapper*, 133 S.Ct. at 1147 (rejecting the Second Circuit's "objectively reasonable likelihood" standard as "inconsistent with our requirement that threatened injury must be certainly impending to constitute injury in fact" (internal quotation marks omitted)); *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 952 (9th Cir. 2013) (finding concrete, particularized injury when utility price increases will affect customer-plaintiffs indirectly due to " 'pass-through' contracts" that "almost certainly" pass along increases). Unlike the First–Use Tax in *Maryland v. Louisiana* or the threatened withdrawal of West Virginia gas in *Pennsylvania v. West Virginia*, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923)—both of which presented state actions with nearly certain price effects for many or all of the plaintiffs' citizens—here, the alleged price effects for consumers are remote, speculative, and contingent upon the decisions of many independent actors in the causal chain in response to California laws that have no direct effect on either price or supply. The Supreme Court has been "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Clapper*, 133 S.Ct. at 1150. In short, Plaintiffs' price-related allegations do not support Article III standing.

[8] Even assuming that the price allegations are not too speculative, they still do not succeed in establishing *parens patriae* standing. In the first proposed scenario, Plaintiffs' egg farmers comply with the Shell Egg Laws to continue selling eggs in California. But, assuming that the farmers do not find other ways to cut their costs, and assuming further that they pass their increased costs on to Plaintiffs' consumers, our caselaw still holds that such allegations fail to support standing. In *Table Bluff*, we held that "no constitutional injury occurs when a manufacturer passes

on higher costs in the form of price increases." 256 F.3d at 885. Although the plaintiffs in *Table Bluff* alleged due process violations, we have applied the same principle in a Commerce Clause case. We held that, although a law regulating firearms

> may tend to restrict supply, nothing in the Act directs manufacturers or dealers to raise the price of regulated weapons. Under *Lujan*, plaintiffs' injury does not satisfy the requirements of Article III because it is "the result of the independent action of some third party not before the court."

**\*6** *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996) (brackets omitted) (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130). The "traceability" principle—that plaintiffs cannot allege standing from a speculative restriction in supply by predicting an eventual increase in price—applies here as well; the State of California will not increase egg prices for Plaintiffs' consumers.

The result in *Maryland v. Louisiana* is not to the contrary. There, explaining that a state "may act as the representative of its citizens in original actions where the injury alleged affects the general population of a State *in a substantial way*," 451 U.S. at 737, 101 S.Ct. 2114 (emphasis added), the Court found that the plaintiff states had alleged injury both to their proprietary interests as gas consumers and to their citizens "from *substantial* economic injury presented by imposition of the First–Use Tax," *id.* at 739, 101 S.Ct. 2114 (emphasis added). Plaintiffs do not allege a similarly substantial injury here. Natural gas is a commodity so universally critical to state governments, businesses, and ordinary consumers that the Supreme Court has twice granted *parens patriae* standing to challenge state actions that directly threaten shortages or price increases. *Id.*; *Pennsylvania*, 262 U.S. at 592, 43 S.Ct. 658 (describing a cut-off in gas as "a matter of grave public concern"). An ordinary consumer commodity, such as eggs, lacks the central economic significance to a state of a utility's product, such as natural gas.

[9] In Plaintiffs' second proposed scenario, the egg farmers in Plaintiffs' states do not bring their farms into compliance with the Shell Egg Laws. If Plaintiffs' allegation correctly predicts that egg prices in the Midwest would drop due to excess supply, no ill effects for egg consumers would come to pass. Indeed, such a change would benefit Plaintiffs' consumers. It would be only egg

Missouri ex rel. Koster v. Harris, F.3d ---- (2016)

Case: 11-56843, 12/01/2016, ID: 10217577, DktEntry: 105, Page 50 of 51

farmers, not consumers, who might suffer an injury in that scenario. But, as we have explained, an injury to egg farmers alone is not sufficient to sustain *parens patriae* standing.

### 3. *Alleged Discrimination*

**[10]**    **[11]**    Finally, Plaintiffs' reliance on cases granting *parens patriae* standing to challenge discrimination against a state's citizens is misplaced. The Shell Egg Laws do not distinguish among eggs based on their state of origin. A statute that treats "both intrastate and interstate products" alike "is not discriminatory." *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 948 (9th Cir. 2013).

In *Snapp*, Puerto Rico, acting as *parens patriae*, sued on behalf of its workers who allegedly suffered discrimination under a federal hiring program. The Court rejected "too narrow a view of the interests at stake." *Snapp*, 458 U.S. at 609, 102 S.Ct. 3260. Although only 787 jobs were at issue, the nature of the discrimination affected all Puerto Ricans, so Puerto Rico could pursue relief for all residents under a *parens patriae* theory. *Id.* But *Snapp* does not assist Plaintiffs because there is no discrimination here, whether to the few or to the many. As noted, California egg farmers are subject to the same rules as egg farmers from all other states, including California itself.

*Georgia v. Pennsylvania R. Co.*, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945), is no more helpful to Plaintiffs than is *Snapp*. There, Georgia sued a collection of southern railroads, alleging discriminatory price-fixing to the detriment of the entire economy of Georgia. The Court held that the State was not a mere nominal plaintiff, with "individual shippers being the real complainants." *Id.* at 452, 65 S.Ct. 716. Instead, the implications of price discrimination against Georgia-based commerce were "matters of grave public concern in which Georgia ha[d] an interest apart from that of particular individuals who may be affected," *id.* at 451, 65 S.Ct. 716, because rail rates "may arrest the development of a State or put it at a decided disadvantage in competitive markets," *id.* at 450, 65 S.Ct. 716. By contrast, Plaintiffs allege no trade barriers erected against their broader economies and, again, the Shell Egg Laws are not discriminatory. Accordingly, Plaintiffs' allegations of discrimination do not establish *parens patriae* standing.

### B. *Leave to Amend*

**\*7**    **[12]**    **[13]**    **[14]**    Plaintiffs urge us to reverse the district court's denial of leave to amend their complaint. They seek "[a]t the very least ... to plead the additional information [that they have] gathered since the Shell Egg Laws went into effect." [3]    "Denial of leave to amend is reviewed for an abuse of discretion." *Dougherty v. City of Covina*, 654 F.3d 892, 897 (9th Cir. 2011). "Dismissal without leave to amend is improper unless it is clear, upon *de novo* review, that the complaint could not be saved by any amendment." *Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1061 (9th Cir. 2004). But a "district court does not err in denying leave to amend where the amendment would be futile." *Id.* (internal quotation marks omitted). An amendment is futile when "no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense." *Miller v. Rykoff–Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988). We find no abuse of discretion.

**[15]**    First, Plaintiffs cannot satisfy the requirements of standing by adding events that have occurred after the Shell Egg Laws took effect. "[S]tanding is determined as of the commencement of litigation." *Yamada v. Snipes*, 786 F.3d 1182, 1203 (9th Cir.), *cert. denied*, ––– U.S. ––––, 136 S.Ct. 569, 193 L.Ed.2d 428 (2015) (internal quotation marks omitted); *accord D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1036 (9th Cir. 2008). Plaintiffs brought this action *before* the Shell Egg laws took effect. Accordingly, later developments cannot save the complaint.

**[16]**    Second, Plaintiffs argue that certain allegations *were* available when the complaint was filed and that they should be allowed to include them now. In particular, Plaintiffs wish to allege that eggs are an important, affordable source of protein with which the Shell Egg Laws threaten to interfere, and that the threat of increased egg prices affects not just egg farmers, but also "grocers, bakers, and restaurant owners." Those allegations would still fail to establish standing because, at most, they allege a potential price increase for consumers *indirectly* resulting from the Shell Egg Laws. As noted earlier, our precedents hold that such speculative allegations are insufficient for *parens patriae* standing. *Table Bluff*, 256 F.3d at 885; *San Diego Cty. Gun Rights Comm.*, 98 F.3d at 1130. Plaintiffs also allege that the price of eggs

Missouri ex rel. Koster v. Harris, --- F.3d ---- (2016)

Case: 11-56843, 12/01/2016, ID: 10217577, DktEntry: 105, Page 51 of 51

might drop. Again, as discussed above, the contingent and uncertain nature of the alternatives available to plead when this complaint was filed are inadequate to support Article III standing.

In short, Plaintiffs would be unable to assert *parens patriae* standing in an amended complaint. The district court did not err by denying leave to amend.

### C. *Dismissal With Prejudice*

**[17]** **[18]** Finally, Plaintiffs argue that, because the district court dismissed the complaint for lack of subject matter jurisdiction, the dismissal should have been *without* prejudice. "We review for abuse of discretion a district court's decision to dismiss with prejudice." *Okwu v. McKim*, 682 F.3d 841, 844 (9th Cir. 2012).

**[19]** **[20]** In general, dismissal for lack of subject matter jurisdiction is without prejudice. *See City of Oakland v. Hotels.com LP*, 572 F.3d 958, 962 (9th Cir. 2009) ("[F]ailure to exhaust administrative remedies is properly treated as a curable defect and should generally result in a dismissal without prejudice."); *Kelly v. Fleetwood Enters., Inc.*, 377 F.3d 1034, 1036 (9th Cir. 2004) (dismissing a complaint without prejudice when the amount in controversy requirement was not met); *Freeman v. Oakland Unified Sch. Dist.*, 179 F.3d 846, 847 (9th Cir. 1999) (order) ("Dismissals for lack of jurisdiction should be without prejudice so that a plaintiff may reassert his claims in a competent court." (internal quotation marks and ellipsis omitted)). Exceptions to the general rule include dismissals on the ground of sovereign immunity, *Lake Wash. Sch. Dist. No. 414 v. Office of Superintendent of Pub. Instr.*, 634 F.3d 1065, 1069 (9th Cir. 2011), and situations in which the plaintiff "could not have possibly amended his complaint to allege an injury in fact," *Schmier v. U.S. Court of Appeals for Ninth Circuit*, 279 F.3d 817, 824 (9th Cir. 2002).

**\*8** The theory undergirding the general rule is that "the merits have not been considered" before dismissal. *Cooper v. Ramos*, 704 F.3d 772, 777 (9th Cir. 2012). No recognized exception to that general rule applies here. Plaintiffs have not satisfied the requirements of *parens patriae* standing. But in theory, Plaintiffs could allege post-effective-date facts that might support standing. As a result, the complaint should have been dismissed *without* prejudice. *See City of Oakland*, 572 F.3d at 962 (affirming dismissal but remanding to dismiss without prejudice); *Kelly*, 377 F.3d at 1040 (affirming with instructions to enter order of dismissal without prejudice).

The judgment of the district court is **AFFIRMED** and the case is **REMANDED** with instructions to dismiss this action without prejudice.

**All Citations**

--- F.3d ----, 2016 WL 6803046

---

Footnotes

**\*\*** The Honorable Raner C. Collins, Chief United States District Judge for the District of Arizona, sitting by designation.

**1** It is unclear whether "substantial segment of the population" and "interest apart from the interest of particular private parties" are separate elements of standing. *See, e.g., Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 847 (9th Cir. 2011) (describing these as separate requirements). *Snapp* itself suggests that "substantial segment" may be merely an additional explanation of the need for the State to be "more than a nominal party." 458 U.S. at 607, 102 S.Ct. 3260. The district court likewise combined these concepts into one element. Given the close similarity of the parties' arguments under these headings, we discuss the two formulations as a single element, but we would reach the same conclusion even if we treated them separately.

**2** At a hearing, the district court asked Plaintiffs where in their complaint they alleged harm to more than just egg producers. Plaintiffs' lawyer pointed to paragraphs 7 and 13. Paragraph 7 describes harm to egg farmers. Paragraph 13 includes no specific facts, stating only, in conclusory fashion, that "Missouri's economy and status within the federal system will be irreparably injured."

**3** As construed by the district court and as argued on appeal, Plaintiffs seek to amend their complaint. They do not seek to supplement the pleadings pursuant to Federal Rule of Civil Procedure 15(d).

---

   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.